**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EASTERN ASSOCIATED COAL
CORPORATION,
Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR;
PEARL D. SCARBRO,
Respondents.

No. 99-1312

On Petition for Review of an Order of the
Benefits Review Board.
(97-1811-BLA)

Argued: March 3, 2000

Decided: July 12, 2000

Before WILKINS, NIEMEYER, and MICHAEL,
Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Wilkins and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Mark Elliott Solomons, ARTER & HADDEN, L.L.P.,
Washington, D.C., for Petitioner. Jeffrey Steven Goldberg, Office of
the Solicitor, UNITED STATES DEPARTMENT OF LABOR,

Washington, D.C., for Respondent Director; Frederick Klein Muth, HENSLEY, MUTH, GARTON & HAYES, Bluefield, West Virginia, for Respondent Scarbro. **ON BRIEF:** Laura Metcoff Klaus, ARTER & HADDEN, L.L.P., Washington, D.C., for Petitioner. Henry L. Solano, Solicitor of Labor, Donald S. Shire, Associate Solicitor of Labor for Black Lung Benefits, Christian P. Barber, Counsel for Appellate Litigation, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director.

_____

## OPINION

NIEMEYER, Circuit Judge:

The Department of Labor's Benefits Review Board affirmed an award of survivor's benefits to Pearl Scarbro under the Black Lung Benefits Act, based on the administrative law judge's finding that Scarbro successfully invoked the irrebuttable presumption under 30 U.S.C. § 921(c)(3) and 20 C.F.R. § 718.304 that the death of her husband, a coal miner, was due to pneumoconiosis. Rejecting the coal company's challenge on various grounds to the proper invocation of the irrebuttable presumption, we affirm the award of benefits.

I

Delbert Scarbro worked as a coal miner for at least 26 years, ending in 1973. He died in 1991, and according to his physician, the primary cause of his death was a cardiovascular accident, with coal worker's pneumoconiosis as a significant condition contributing to death. After Delbert Scarbro's death, his widow, Pearl Scarbro, filed a claim for survivor's benefits under the Black Lung Benefits Act, and the claim was referred to the Office of Administrative Law Judges. Eastern Associated Coal Corporation ("Eastern Coal") agreed that it was the "responsible operator" and therefore would be liable for the payment of benefits if any were to be awarded to Scarbro. See 20 C.F.R. § 725.492. Eastern Coal also agreed that Delbert Scarbro had pneumoconiosis and that he had 26 years of coal mine employment. On the only open issue -- whether the miner died due to pneumoconi-

osis -- the administrative law judge ("ALJ") found that Scarbro successfully invoked the irrebuttable presumption of 20 C.F.R. § 718.304. In awarding benefits, the ALJ concluded that both x-ray evidence and autopsy evidence supported the invocation of the presumption.

The ALJ considered 20 readings by doctors of 14 x-rays made between 1963 and February 7, 1991. The last x-ray was taken approximately seven months before the miner's death. The x-rays taken before 1970 were uniformly read as negative for pneumoconiosis. The 1970 x-ray was read once as positive and once as negative for simple pneumoconiosis. Subsequent x-rays were consistently read as positive for simple pneumoconiosis, and the February 7, 1991 x-ray was read to reveal "complicated pneumoconiosis." This film was reviewed by eight doctors, seven of whom read the film as positive for complicated pneumoconiosis in that it showed one or more opacities larger than one centimeter in diameter. The eighth reviewer observed "extensive pulmonary densities consistent with pneumoconiosis," but did not elaborate by discussing the presence or absence of large opacities or other indications of complicated pneumoconiosis.

The ALJ also considered an autopsy report prepared by Dr. Zarina Rasheed. Upon gross examination, Dr. Rasheed found "advanced atherosclerotic changes with no areas of total occlusion" in the coronary arteries, and "many pneumoconiotic nodules" ranging "from 0.5 to 0.8 cm" within the lung parenchyma. Her microscopic examination revealed "[p]rominent pneumoconiotic nodules . . . scattered all over the pulmonary parenchyma. These range[d] in size from 0.5 cm to 1 cm." She also determined that the nodules "occup[ied] more than 50-70% of the pulmonary parenchyma [causing] extensive damage to it. Sections from the other areas of the lungs show[ed] thickening of the pleurae with areas showing subpleural fibrosis and coal dust deposition." She diagnosed a number of pulmonary ailments and concluded:

> The main disease in this patient was extensive obstructive pulmonary disease which was caused mainly by panlobular macronodular pneumoconiosis. Terminal events were consolidation pneumonia and aspiration pneumonitis which added injury to already marginally functioning lungs. Other

3

contributory causes were coronary atherosclerosis, with heart failure.

The ALJ also considered the opinions of Dr. Richard Naeye and Dr. Jerome Kleinerman, who reviewed tissue slides from the autopsy. In his September 1992 report, Dr. Naeye reviewed the autopsy report and fifteen of the slides. He found that many of the deposits he observed were "large enough to be classified as anthracotic micro-nodules" and that some "reach 7-8 mm in diameter so they can be classified as anthracotic macronodules." He diagnosed severe simple coal worker's pneumoconiosis, and concluded that"[i]f the lung sections provided for my review are representative of the lungs as a whole . . . [t]he pneumoconiosis may also have been severe enough to have played an important role in his death."

Dr. Kleinerman, who reviewed medical records in addition to autopsy tissue slides, characterized the miner's medical condition in his September 1993 report as mild to moderate simple coal worker's pneumoconiosis, but not complicated coal worker's pneumoconiosis. Specifically, he stated, "The macular and nodular lesions vary from 0.3 cm to 1.7 cm in size. These lesions are considered to be within the range of simple coal worker's pneumoconiosis." He also stated his "opinion [that] Mr. Scarbro would have died as and when he did even if he had not been exposed to any coalmine dust. His simple coal-workers pneumoconiosis and simple nodular silicosis did not contribute [to] or hasten Mr. Scarbro's death or in any way compromise his pulmonary function."

In January 1994, Dr. Naeye was asked to conduct a second review, which he based on Scarbro's medical records and Dr. Kleinerman's report. Dr. Naeye concluded that the tissue samples he had previously examined could not in fact have been representative of the lungs as a whole. He based this conclusion on the fact that Scarbro's exposure to coal dust had ended in 1973, and his pulmonary functions were at that time, and in 1980, determined to be normal. He stated that simple coal worker's pneumoconiosis "rarely progresses to a more severe disorder if a coal worker quits exposure to mine dust." Dr. Naeye echoed Dr. Kleinerman's conclusion, saying that any pulmonary abnor-malities exhibited by Scarbro "were never disabling in any way and never hastened his death or contributed in any way to his death."

4

Finally, the ALJ considered the opinion of Dr. Joseph Renn, who had reviewed the miner's medical records, but not the autopsy slides. His June 1994 report stated that while Scarbro suffered from simple coal worker's pneumoconiosis, "there was no ventilatory impairment as demonstrated by physiologic studies performed over the years." Dr. Renn determined "with a reasonable degree of medical certainty" that Scarbro's death was not affected by his exposure to coal dust or by his condition of pneumoconiosis.

In weighing the x-ray evidence, the ALJ noted that the earlier films read negative for pneumoconiosis, while the later ones read positive. He determined that this evidence showed a progressively deteriorating condition over time and so gave determinative weight to the last x-rays, taken in 1991. He also weighed the autopsy evidence presented in the reports by Drs. Rasheed, Naeye, and Kleinerman. The ALJ credited Dr. Rasheed's report as the most authoritative because she had the "opportunity to see the miner's entire respiratory system, and was the only doctor who commented on the amount of lung tissue damaged by the pneumoconiosis." The ALJ read Dr. Rasheed's report, which found nodules up to one centimeter in diameter over 50 to 70% of Scarbro's lungs, as establishing the existence of "massive lesions," relying on a dictionary definition of "massive" as "extensive and severe."

Having thus weighed the evidence before him, the ALJ concluded that "both the x-ray and autopsy evidence [were] sufficient to invoke the presumption, and there [was] no other evidence, such as a CAT or CT scan, which would be probative under 20 C.F.R.§ 718.304(c)."

The Benefits Review Board affirmed the ALJ's award of benefits, and Eastern Coal filed this petition for review.

II

Under the Black Lung Benefits Act, 30 U.S.C. §§ 901-945, an eligible claimant is entitled to survivor's benefits if the miner's death was "due to" pneumoconiosis. 20 C.F.R. § 718.205. Section 921(c)(3) of the Act creates an irrebuttable presumption that the death was due to pneumoconiosis if (A) an x-ray of the miner's lungs shows at least one opacity greater than one centimeter in diameter; (B) a biopsy

5

reveals "massive lesions" in the lungs; or (C) a diagnosis by other means reveals a result equivalent to (A) or (B). [1] The condition described by these criteria is frequently referred to as "complicated pneumoconiosis," although that term does not appear in the statute. See, e.g., Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 7, 11 (1976); Double B Mining, Inc. v. Blankenship, 177 F.3d 240, 242-43 (4th Cir. 1999); cf. 20 C.F.R. § 410.418 (employing same criteria in defining "complicated pneumoconiosis" for Social Security purposes).

While 30 U.S.C. § 921(c)(3) sets forth, in clauses (A), (B), and (C), three different ways to establish the existence of statutory complicated pneumoconiosis for purposes of invoking the irrebuttable presumption, these clauses are intended to describe a single, objective condition. Otherwise, the three prongs would be describing different conditions, leading to "the irrational result that the determination of whether a miner has [statutory complicated pneumoconiosis] could turn on the method of diagnosis rather than on the severity of his disease." Double B Mining, 177 F.3d at 243. Therefore, in applying the standards set forth in each prong, "one must perform equivalency determinations to make certain that regardless of which diagnostic

_____

[1] 30 U.S.C. § 921(c)(3) provides in full:

> If a miner is suffering or suffered from a chronic dust disease of the lung which (A) when diagnosed by chest roentgenogram, yields one or more large opacities (greater than one centimeter in diameter) and would be classified in category A, B, or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization, (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is made by other means, would be a condition which could reasonably be expected to yield results described in clause (A) or (B) if diagnosis had been made in the manner prescribed in clause (A) or (B), then there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis or that his death was due to pneumoconiosis or that at the time of his death he was totally disabled by pneumoconiosis, as the case may be.

The regulation implementing this statutory provision employs virtually the same language. See 20 C.F.R. § 718.304.

6

technique is used, the same underlying condition triggers the irrebuttable presumption." Id.; see also Clites v. Jones & Laughlin Steel Corp., 663 F.2d 14, 16 (3d Cir. 1981). And,"[b]ecause prong (A) sets out an entirely objective scientific standard"-- i.e. an opacity on an x-ray greater than one centimeter -- x-ray evidence provides the benchmark for determining what under prong (B) is a"massive lesion" and what under prong (C) is an equivalent diagnostic result reached by other means. Double B Mining, 177 F.3d at 243.

Prongs (A), (B), and (C) are stated in the disjunctive; therefore a finding of statutory complicated pneumoconiosis may be based on evidence presented under a single prong. But the ALJ must in every case review the evidence under each prong of § 921(c)(3) for which relevant evidence is presented to determine whether complicated pneumoconiosis is present. See Lester v. Director, OWCP, 993 F.2d 1143, 1145 (4th Cir. 1993) (A claimant is entitled to the benefit of the § 921(c)(3) "irrebuttable presumption not because he has provided a single piece of relevant evidence, but because he has a `chronic dust disease of the lung,' commonly known as complicated pneumoconiosis. To make such a determination, the OWCP necessarily must look at all of the relevant evidence presented"); see also 30 U.S.C. § 923(b) ("In determining the validity of claims under this part, all relevant evidence shall be considered"); Island Creek Coal Co. v. Compton, 211 F.3d 203, 208-09 (4th Cir. 2000). Evidence under one prong can diminish the probative force of evidence under another prong if the two forms of evidence conflict. Yet,"a single piece of relevant evidence," Lester, 993 F.2d at 1145, can support an ALJ's finding that the irrebuttable presumption was successfully invoked if that piece of evidence outweighs conflicting evidence in the record. Thus, even where some x-ray evidence indicates opacities that would satisfy the requirements of prong (A), if other x-ray evidence is available or if evidence is available that is relevant to an analysis under prong (B) or prong (C), then all of the evidence must be considered and evaluated to determine whether the evidence as a whole indicates a condition of such severity that it would produce opacities greater than one centimeter in diameter on an x-ray. See Double B Mining, 177 F.3d at 243-44. Of course, if the x-ray evidence vividly displays opacities exceeding one centimeter, its probative force is not reduced because the evidence under some other prong is inconclusive or less vivid. Instead, the x-ray evidence can lose force only if other evidence

7

affirmatively shows that the opacities are not there or are not what they seem to be, perhaps because of an intervening pathology, some technical problem with the equipment used, or incompetence of the reader.

In this case, the ALJ considered evidence relevant to prongs (A) and (B), and concluded that each prong was satisfied, entitling Scarbro to the § 921(c)(3) irrebuttable presumption. As to prong (A), the ALJ gave "determinative weight" to the x-ray of February 7, 1991, noting that seven doctors had read the x-ray to reveal opacities larger than one centimeter. He therefore concluded that the February 1991 x-ray "clearly" meets the standard for invoking the irrebuttable presumption under prong (A). As to prong (B), the ALJ found that autopsy evidence "clearly" revealed massive lesions, relying principally on the report of the autopsy prosector, Dr. Rasheed. The ALJ noted Dr. Rasheed's findings that there were "[p]rominent pneumoconiotic nodules . . . scattered all over the pulmonary parenchyma" and that the nodules had "invad[ed]" more than 50-70% of the lungs. While the ALJ did not rely on the reports of Drs. Naeye and Kleinerman, who based their opinions on their review of histological slides from the autopsy, to find the presence of massive lesions, the ALJ noted that Dr. Naeye reported lesions as large as 0.8 centimeters and that Dr. Kleinerman reported lesions as large as 1.7 centimeters. The ALJ further noted that both doctors found a large number of lesions, even though they concluded that the lesions were consistent with "simple coal workers pneumoconiosis."

Although the analysis employed by the ALJ with respect to prong (B) was incorrect, the autopsy evidence did not undermine the ALJ's conclusion that prong (A) was satisfied. The ALJ's ultimate conclusion that "both the x-ray and autopsy evidence[were] sufficient to invoke the [§ 921(c)(3)] presumption" was therefore correct. We conclude that the Benefits Review Board properly affirmed the ALJ, and accordingly, the claimant in this case is entitled to an irrebuttable presumption that pneumoconiosis was a contributing cause of the miner's death.

Eastern Coal's challenge primarily attacks the ALJ's method or explanations for crediting evidence. In particular, Eastern Coal argues (1) that the ALJ improperly placed greater weight on the 1991 x-rays

8

than on earlier ones; (2) that the ALJ improperly relied on a dictionary definition of "massive" in concluding that prong (B) was satisfied; and (3) that the ALJ improperly discounted the opinions of Drs. Naeye and Kleinerman who, based on their review of autopsy slides and medical records, diagnosed the miner's condition as simple pneumoconiosis rather than complicated pneumoconiosis.

Much of Eastern Coal's argument depends on an assumption that there is a conflict in the record between the x-ray evidence and the autopsy evidence. This perceived conflict is based on two flawed premises. First, Eastern Coal assumes that the statutory definition of "complicated pneumoconiosis" must be congruent with a medical or pathological definition. Second, Eastern Coal assumes that the reports of Drs. Naeye and Kleinerman, who gave opinions that the autopsy slides did not meet this pathological definition, undermine the ALJ's finding of statutory complicated pneumoconiosis.

Section 921(c)(3), which creates the irrebuttable presumption of causation, does not refer to the triggering condition as "complicated pneumoconiosis," nor does it refer to a medical condition that doctors independently have called complicated pneumoconiosis. Rather, the presumption under § 921(c)(3) is triggered by a congressionally defined condition, for which the statute gives no name but which, if found to be present, creates an irrebuttable presumption that disability or death was caused by pneumoconiosis.[2] The statute provides three methods for establishing the existence of the condition, but these methods would not necessarily be useful as diagnostic guidelines in a clinical setting. In short, the statute betrays no intent to incorporate a purely medical definition.

Because of the possibility -- even likelihood-- of divergence between medical and legal standards in the context of the Black Lung Act, we have counseled that one must evaluate the evidence with a

_____

[2] The House bill that became the Black Lung Benefits Act originally contained a provision defining "complicated pneumoconiosis"; in conference, this provision was deleted, but the defining criteria were retained in a new provision creating the irrebuttable presumption. See H.R. Rep. No. 91-563, reprinted in 1969 U.S.C.C.A.N. 2503, 2543; H. Conf. Rep. No. 91-761, reprinted in 1969 U.S.C.C.A.N. 2578, 2603-05.

9

"sensitiv[ity] to conflicting meanings ascribed to the same words by lawyers and doctors, as well as to idiosyncratic differences in phraseology among doctors themselves." Piney Mountain Coal Co. v. Mays, 176 F.3d 753, 761 (4th Cir. 1999). And to the extent there is a divergence between the medical and legal standards for complicated pneumoconiosis, we must apply the standard established by Congress.

Yet Eastern Coal's legal argument under § 921(c)(3) appears to insist on using a medical definition for complicated pneumoconiosis. For instance, it states:

> Complicated pneumoconiosis is a well-known condition that has been extensively researched. The condition exhibits express and well understood clinical and pathological damage to lung tissue and architecture. It is not simply a bad case of simple pneumoconiosis, but a very different and far more serious disease. . . . [It] is not some arcane legal or political disease diagnosable only by Congress or courts.

Pet'r Br. at 19. Eastern Coal's assumption that 30 U.S.C. § 921(c)(3) and 20 C.F.R. § 718.304 are directed at a clinical or pathological understanding of "complicated pneumoconiosis" is further revealed by its argument that

> [m]iners with complicated pneumoconiosis usually complain of cough productive of inky black material and the disease produces consolidation and collapse of the affected area of the lung, pulmonary arterial hypertension, right ventricular failure, and cor pulmonale . . . . None of these findings were present in Scarbro's case.

Pet'r Br. at 28.

In the same vein, Eastern Coal questions the usefulness of x-ray evidence for determining the existence of complicated pneumoconiosis, asserting that "no physician would accept the x-ray as superior to the autopsy as a diagnostic tool in this regard." Pet'r Br. at 21-22. This observation misses the mark. "Complicated pneumoconiosis," in the statutory sense, is established by the application of congressio-

10

nally defined criteria, and, as we have been careful to note, the most objective measure of the condition specified by§ 921(c)(3) is obtained through x-rays. See Double B Mining, 177 F.3d at 243. Accordingly, Eastern Coal's efforts to minimize the importance of the x-ray evidence must fail. Cf. Lane Hollow Coal Co. v. Director, OWCP, 137 F.3d 799, 804 (4th Cir. 1998) ("Disputing the clinical accuracy of the [provisions of the Act] is not rebuttal"); Thorn v. Itmann Coal Co., 3 F.3d 713, 719 (4th Cir. 1993) (same).

Because Eastern Coal focuses on the medical condition of complicated pneumoconiosis, and not the statutory criteria for creating an irrebuttable presumption, its underlying assumption that the ALJ had conflicting evidence before him is flawed. The report by Dr. Kleinerman, for example, which was based on his examination of histological slides and which revealed pneumoconiotic nodules up to 1.7 centimeters in size, does not undercut the ALJ's finding that prong (B) was satisfied. Even though Dr. Kleinerman concluded that, in his medical opinion, the lesions he observed did not amount to complicated pneumoconiosis, he did not state whether these lesions met the statutory criteria of § 921(c)(3), i.e. whether, when x-rayed, they would show as opacities greater than one centimeter. We are given no reason to believe that nodules of 1.7 centimeters would not produce x-ray opacities greater than one centimeter. To the contrary, the 1991 x-ray, showing opacities greater than one centimeter in diameter, provides persuasive evidence that the miner's lesions did in fact show as opacities of that size. Eastern Coal has not attempted to challenge this finding made by seven of the eight reviewing doctors (and uncontradicted by the eighth).

Challenging the ALJ's evaluation and weighing of evidence, Eastern Coal takes issue with the ALJ's decision to accord greater weight to the February 1991 x-ray than to earlier ones. Eastern Coal contends that, in doing so, the ALJ improperly applied a"later is better" rule despite "uncontradicted" medical evidence in the record that simple pneumoconiosis could not have progressed to complicated pneumoconiosis in the years following the miner's retirement from the mines. To support this contention, however, Eastern Coal points only to Dr. Naeye's equivocal statement that the condition observed in the miner's earlier x-rays "rarely progresses to a more severe disorder." Eastern Coal's argument ignores the assumption of progressivity that

underlies much of the statutory regime, see Mullins Coal Co. v. Director, OWCP, 484 U.S. 135, 151 (1987) (describing the etiology of pneumoconiosis as "progressive and irreversible"); Turner Elkhorn, 428 U.S. at 7-8, as well as the x-ray evidence in this case indicating a progression in the severity of the miner's pneumoconiotic symptoms from 1970 onward. The ALJ's "later is better" rule was not imposed mechanically or arbitrarily, but was applied in the context of a record in which the later x-rays were not inconsistent with the earlier ones. Cf. Lane Hollow Coal Co. v. Director, OWCP, 137 F.3d 799, 803 n.6 (4th Cir. 1998) (rejecting "later is better" rule when evidence indicates that condition improved, rather than deteriorated, over time); Adkins v. Director, OWCP, 958 F.2d 49, 51-52 (4th Cir. 1992) (same).

Eastern Coal also argues that the ALJ improperly relied upon a dictionary to discern the meaning of the term "massive" as used in prong (B) of the statute and regulation. Because Congress chose to use the word "massive" in its ordinary sense without giving it a precise statutory or medical definition, there can be no harm in the ALJ's having consulted the dictionary to find equivalent meanings for the word. As we have emphasized, any such definition must be applied so that the term "massive lesions" will describe the same condition that would be disclosed by application of the prong (A) standard based on the size of x-ray opacities. In this case, we see no indication that the ALJ's use of a dictionary definition resulted in an assessment of the autopsy evidence that was at odds with a correct interpretation of the statute.

For the foregoing reasons, we affirm the decision of the Benefits Review Board affirming the ALJ's order awarding benefits to Pearl Scarbro.

AFFIRMED

12