UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CLINCHFIELD COAL COMPANY,

*Petitioner,*

v.

DOROTHY FULTZ, Widow of Clarence
Fultz, deceased; DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF
LABOR,

*Respondents.*

No. 02-1107

On Petition for Review of an Order
of the Benefits Review Board.
(01-195-BLA)

Argued: January 23, 2003

Decided: April 2, 2003

Before WILLIAMS and MOTZ, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Vacated and remanded by unpublished per curiam opinion. Judge
Motz wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Timothy Ward Gresham, PENNSTUART, Abingdon,
Virginia, for Petitioner. Terry Gene Kilgore, WOLFE, WILLIAMS &
RUTHERFORD, Norton, Virginia, for Respondents. **ON BRIEF:**

Joseph E. Wolfe, Bobby S. Belcher, Jr., WOLFE, WILLIAMS & RUTHERFORD, Norton, Virginia, for Respondent Fultz.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

The Department of Labor's Benefits Review Board affirmed an award of survivor's benefits to Dorothy Fultz under the Black Lung Benefits Act, 30 U.S.C.A. §§ 901-945 (1986 & Supp. 2002) (the Act), based on the administrative law judge's finding that Mrs. Fultz successfully invoked the irrebuttable presumption under 30 U.S.C.A. § 921(c)(3) and 20 C.F.R. § 718.304 (2002) that the death of her husband, a coal miner, was due to pneumoconiosis. Recognizing that there was autopsy evidence that showed lesions of 2 centimeters and autopsy evidence that showed evidence of 1.2 centimeter lesions, the ALJ made an equivalency determination, finding that "regardless of whether [the lesions] exceeded 2 centimeters . . . or were 1.2 centimeters . . ., [they] would be expected on x-ray to yield one or more large opacities (i.e., greater than 1 centimeter in diamater)" and that "it is undisputed that [Fultz] had at least 1.2 centimeter lesions of coal workers pneumoconiosis on autopsy and I find that these autopsy findings satisfy the statutory and regulatory definition." (J.A. at 215.) Because the record in this case lacks any evidence establishing that the size of a lesion on autopsy is equivalent to the size of a lesion on x-ray that would support this equivalency determination, we remand this case for such testimony and any other further proceedings consistent with this opinion.

I.

Clarence Fultz worked for at least thirty years as a coal miner, ending in 1982. He died in 1999, and according to his death certificate,

the cause of his death was respiratory failure due to extensive squamous cell carcinoma with coal worker's pneumoconiosis listed as an underlying condition. Following his death, Dorothy Fultz, his widow, filed an application for survivor's benefits under the Act. The Department of Labor determined that Mrs. Fultz was eligible for benefits, and the claim was referred to the Office of Administrative Law Judges. Clinchfield Coal agreed that it was the "responsible operator" and therefore would be liable for the payment of benefits if any were to be awarded to Mrs. Fultz. *See* 20 C.F.R. §§ 725.490, 725.492 (2002). Clinchfield Coal has also agreed that Mr. Fultz had pneumoconiosis and that he had 30 years of coal mine employment. On the issue of whether the miner died due to pneumoconiosis, the administrative law judge (ALJ) found that Mrs. Fultz successfully invoked the irrebuttable presumption of 20 C.F.R. § 718.304 that the miner's death was due to pneumoconiosis. Although the ALJ considered x-ray evidence, CT scans, autopsy evidence and medical reports, in awarding benefits, the ALJ concluded that only the autopsy evidence supported the invocation of the presumption.

Reviewing the autopsy evidence, the ALJ considered an autopsy report prepared by Dr. Brooks. Upon gross examination, Dr. Brooks found "multiple tracheobronchial lymph nodes showing anthracotic changes and fibrosis" in the trachea, "severe" anthracosis in the lungs, shown by "multiple areas of black macular discoloration," and "multiple areas of fibrosis and firm nodules in both lungs." (J.A. at 32.) In the autopsy report, Dr. Brooks listed, but did not discuss, twenty-two slide cassettes of tissue taken during the autopsy. Dr. Brooks concluded that "[t]he immediate cause of this patient's death is respiratory failure due to complicated coal worker's pneumoconiosis, COPD, metastatic squamous cell carcinoma of the lungs, and multifocal post obstructive acute pneumonia." (J.A. at 33.) In her deposition in the administrative proceeding, Dr. Brooks testified that "virtually every slide has no viable lung tissue left. It's mostly fibrotic." (J.A. at 110.) Asked whether she had found "lesions . . . resulting from coal-dust exposure on his lung in excess of two centimeters," Dr. Brooks replied that she had, and that the lesions meeting that description were "[t]oo numerous to count." (J.A. at 119.)

The ALJ also considered the opinions of Dr. Kleinerman and Dr. Caffrey, who reviewed Mr. Fultz's medical records and tissue slides

from the autopsy. In his report, Dr. Kleinerman found "a moderate profusion of lesions of simple CWP," "[l]esions of simple nodular silicosis," and "[m]acronodular lesions of silicosis," in addition to lesions of squamous cell carcinoma. (J.A. at 44.) Dr. Kleinerman concluded that "Mr. Fultz had a moderate extent of *simple CWP and simple nodular silicosis*," but that his death was the result of "extensive squamous cell carcinoma involving his lungs." (J.A. at 45.) The ALJ noted that Dr. Kleinerman "did not provide an estimate of the size of the lesions attributable either to coal worker's pneumoconiosis or to silicosis." (J.A. at 214.)

In his report, Dr. Caffrey gave a diagnosis based on the autopsy slides of "simple coal worker's pneumoconiosis and macronodular coal worker's pneumoconiosis, extensive," as well as squamous cell carcinoma, emphysema, bronchopneumonia, and pleuritis. (J.A. at 85.) Dr. Caffrey concluded that "the patient's immediate cause of death was due to extensive keratinizing, squamous cell carcinoma" with "terminal[ ], acute bronchopneumonia." (J.A. at 87.) Dr. Caffrey also concluded that Mr. Fultz "showed a moderately severe case of simple coal worker's pneumoconiosis and nodular coal worker's pneumoconiosis." (J.A. at 87.) He reported that "[t]he size of the macronodular lesions that were present on the [autopsy] slides that [he] reviewed were up to 1.2 cms." (J.A. at 87.)

Based on these reports, the ALJ found "that the lesions found on autopsy, regardless of whether they exceeded 2 centimeters as Dr. Brooks found or were 1.2 centimeters as Dr. Caffrey found, would be expected on x-ray to yield one or more large opacities (i.e., greater than 1 centimeter in diameter)." (J.A. at 215.) The ALJ held that considering all of the evidence together, the pathological evidence, including the well-reasoned opinions of Dr. Brooks and Dr. Caffrey, outweighed the other evidence. (J.A. at 215.) Accordingly, the ALJ held that Mrs. Fultz was entitled to the irrebuttable presumption of death due to pneumoconiosis under 20 C.F.R. § 718.304 and awarded benefits to Mrs. Fultz.

The Benefits Review Board affirmed the ALJ's award of benefits, and Clinchfield Coal filed this petition for review.

## II.

We review Mrs. Fultz's claim for benefits under the Act to determine whether substantial evidence supports the factual findings of the ALJ and whether the legal conclusions of the Board and the ALJ are rational and consistent with applicable law. *Bill Branch Coal Corp. v. Sparks*, 213 F.3d 186, 190 (4th Cir. 2000). When reviewing a factual finding, we must affirm the ALJ's decision if it is supported by substantial evidence, *Thorn v. Itmann Coal Co.*, 3 F.3d 713, 718 (4th Cir. 1993), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted). Under the Act, an eligible claimant is entitled to survivor's benefits if the miner's death was "due to" pneumoconiosis. 20 C.F.R. § 718.205 (2002).

When a miner is "afflicted with complicated pneumoconiosis, [it] is 'irrebuttably presumed' . . . that his death was due to pneumoconiosis." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 11 (1976). The irrebuttable presumption applies if "(A) an x-ray of the miner's lungs shows at least one opacity greater than one centimeter in diameter; (B) a biopsy or autopsy reveals "massive lesions" in the lungs; or (C) a diagnosis by other means reveals a result equivalent to (A) or (B)." *Eastern Associated Coal Corp. v. Director, Office of Workers' Compensation Programs*, 220 F.3d 250, 255 (4th Cir. 2000) (citing 30 U.S.C.A. § 921(c)). We have held that the three methods of invoking the irrebuttable presumption found in clauses (A), (B), and (C) "describe a single, objective condition." *Eastern*, 220 F.3d at 255. Therefore, the ALJ must make an equivalency determination "to make certain that regardless of which diagnostic technique is used, the same underlying condition triggers the irrebuttable presumption."[1] *Double*

---

[1]Our dissenting sister is correct that the ALJ must make an equivalency determination. *See post* at 13. That determination, however, must be supported by substantial evidence. The dissent's reliance on *Eastern Associated Coal Corp. v. Director, OWCP*, 220 F.3d 250, 254 (4th Cir. 2000), is misplaced. In *Eastern*, the ALJ considered x-ray evidence including readings by several doctors who read the x-ray as showing one or more opacities larger than one centimeter and autopsy evidence showing lesions of 1.7 centimeters. *Eastern*, 220 F.3d at 253-57. We held that although the ALJ's conclusion that prong (B) was satisfied by the

*B Mining, Inc. v. Blankenship*, 177 F.3d 240, 244 (4th Cir. 1999). Because clause (A) sets out an entirely objective scientific standard, i.e., an opacity on an x-ray greater than one centimeter, we have held that it is the benchmark to which evidence under the other clauses in compared. *See Eastern*, 220 F.3d at 256; *Double B*, 177 F.3d at 244. Accordingly, "massive lesions" sufficient to invoke the irrebuttable

---

autopsy evidence was based on an incorrect analysis, the autopsy evidence did not undermine the ALJ's conclusion that prong (A) was satisfied by the x-ray evidence, *id.* at 257, because where "the x-ray evidence vividly displays opacities exceeding one centimeter, . . . the x-ray evidence can lose force only if other evidence affirmatively shows that the opacities are not there or are not what they seem to be, perhaps because of an intervening pathology, some technical problem with the equipment used, or incompetence of the reader," *id.* at 256. The autopsy evidence did not undermine the x-ray evidence because "[w]e [were] given no reason to believe that nodules of 1.7 centimeters would not produce x-ray opacities greater than one centimeter. To the contrary, the 1991 x-ray, showing opacities greater than one centimeter in diameter, provide[d] persuasive evidence that the miner's lesions did in fact show as opacities of that size." *Id.* at 258.

Thus, in *Eastern*, we did not find that autopsy evidence of lesions of 1.7 centimeters supported invocation of the irrebutable presumption. Instead, we held that where doctors read the x-ray evidence as showing lesions of greater than one centimeter in diameter, autopsy evidence of lesions of 1.7 centimeters did not undermine the x-ray evidence.

In this case, however, the ALJ found that none of the x-ray readings "indicat[ed] opacities of 1 centimeter in diameter or more." (J.A. at 210.) Accordingly, here we are considering whether the autopsy evidence by itself supports invocation of the irrebutable presumption, not whether the autopsy evidence undermines other evidence. The ALJ's equivalency determination in this case is not supported by substantial evidence because we have no testimony, medical report, or evidence indicating that the lesions discovered on autopsy would be expected on x-ray to yield one or more opacities of greater than one centimeter.

The rule that my dissenting colleague posits, that the ALJ's equivalency determination need not be supported by substantial evidence, has no boundaries. For example, it would allow the ALJ to make an equivalency determination that a lesion of 0.75 centimeters on autopsy would show as greater than one centimeter on x-ray.

presumption under clause (B) are those that "when x-rayed . . . would show as opacities greater than one centimeter." *Eastern*, 220 F.3d at 258.

After reviewing the evidence in this case, the ALJ concluded "that the lesions found on autopsy, regardless of whether they exceeded 2 centimeters as Dr. Brooks found or were 1.2 centimeters as Dr. Caffrey found, would be expected on x-ray to yield one or more large opacities (i.e., greater than 1 centimeter in diameter)." (J.A. at 215.) There was no testimony or medical report or evidence indicating that the lesions discovered on autopsy would be expected on x-ray to yield one or more opacities of greater than one centimeter or that the size of a lesion on autopsy was equivalent or less than the expected size on x-ray. In fact, both Dr. Caffrey and Dr. Brooks declined to offer an opinion on that point. When asked whether he could state to a reasonable degree of medical certainty that the lesions he saw on the autopsy slides were "the medical equivalent of a one centimeter x-ray reading," Dr. Caffrey stated "I don't know."[2] (J.A. at 213-14.) Simi-

---

[2]The dissent reads too much into Dr. Caffrey's deposition testimony. The entire sequence of questions is as follows:

> Q.  Okay. Do you feel that you could state to a reasonable degree of medical certainty, Dr. Caffrey, that from what you saw on the slides, do you think that that's a medical equivalent of a one centimeter x-ray reading of a nodule of coal dust?
>
> A.  I don't know, sir. It's very difficult, in my opinion, to be very objective in comparing the size of the lesion grossly or microscopically with the x-ray changes, unless you're looking at them at the same time.
>
> In other words, if you had the x-ray in the autopsy suite, up on the Roentgenogram, the x-ray view boxes, and you looked at those, then measured the size — and you had a highly skilled radiologist with you — and then you saw the lesions at the autopsy table and you compared them; that, to me, is the only real objective way to determine if the sizes are very similar.
>
> Q.  Okay. But the x-rays are done on a scale of 1-to-1; in other words, there's no enlargement or decrease in size on an x-ray, is there —
>
> A.  Not that I know of.

larly, when asked if she could opine as to whether the lesions found on autopsy "were complicated pneumoconiosis [that] would have shown up on a chest x-ray," Dr. Brooks stated, "I can't comment on that." (J.A. at 122.) Thus, when specifically questioned, Dr. Brooks herself was unable to correlate her findings on autopsy with the expected size of the lesions on x-ray.

While there may be lesions so large that it is self-evident that they would have shown as opacities greater than one centimeter on x-ray, we cannot presume that lesions of 1.2 centimeters[3] are so large that

---

> Q.  — unless it's noted or something?
>
> A.  Not that I know of.
>
> Q.  Okay. So do you think it's very possible that the 1.2 centimeter size could be the medical equivalent of a one centimeter measurement on a x-ray?
>
> A.  It could be.
>
> Q.  And would you go as far as to say, very likely it would be the equivalent?
>
> A.  I don't know. That would be speculation on my part.

(J.A. at 164-65.) This testimony is hardly the substantial evidence required to support the ALJ's finding of equivalency. Rather than being a concession that lesions of 1.2 centimeters would show on x-ray as greater than one centimeter, *see post* at 11-12, 14, Dr. Caffrey's testimony "it could be" is simply part of his string of responses indicating that he did not know how the lesions would show on x-ray and that any guess would be speculation. The ALJ noted that Dr. Caffrey "declined to say that the two [the autopsy and the x-ray] would be equivalent as it would involve speculation on his part." (J.A. at 214.)

[3]The dissent would have us rely on the testimony of Dr. Brooks to support the equivalency determination, even though the ALJ explicitly did not. *See post* at 14. The ALJ held that even if the lesions "were 1.2 centimeters as Dr. Caffrey found," the lesions would be expected to show as greater than one centimeter on x-ray and that "it is undisputed that the Miner had at least 1.2 centimeter lesions of coal workers pneumoconiosis on autopsy and I find that these autopsy findings satisfy the statutory and regulatory definition." (J.A. at 215.) Our review of an ALJ's findings, as

there need be no further testimony or evidence as to whether they would have shown on x-ray as opacities of greater than one centimeter. *Cf. Double B*, 177 F.3d at 244 (concluding that evidence of lesions of 1.3 centimeters, standing alone, was insufficient to determine whether miner had complicated pneumoconiosis and remanding for an equivalency determination); *see also id.* (noting that "'nodules are generally larger on autopsy examination than they appear on a chest radiograph'" (quoting N. LeRoy Lapp, M.D., *A Lawyer's Medical Guide to Black Lung Litigation*, 83 W. Va. L. Rev. 721, 736 (1981))). Without more, we cannot conclude that the ALJ's finding that the lesions would have shown as one or more opacities of greater than one centimeter is supported by substantial evidence.[4]

## III.

Because there was insufficient evidence to support the ALJ's finding that Mr. Fultz had lesions that would have shown as greater than one centimeter on x-ray, we vacate the Board's decision upholding

affirmed by the Board, is very limited. "We may not reweigh the evidence or substitute our views for those of the ALJ . . . ." *Lane v. Union Carbide Corp.*, 105 F.3d 166, 170 (4th Cir. 1997). As the ALJ's finding was lesions of 1.2 centimeters satisfied the statutory and regulatory definition, it is that finding that we must review. Plainly, Dr. Brooks's testimony does nothing to support this finding. As there is no medical report, testimony or other evidence indicating that the lesions of 1.2 centimeters would be expected to show as greater than one centimeter on x-ray, the finding is not supported by substantial evidence.

[4]Clinchfield Coal argues that the autopsy report should not have been considered because it did not comply with 20 C.F.R. § 718.106 (2000). Mrs. Fultz argues, and the BRB concluded, that the autopsy report, when considered with Dr. Brooks's later deposition testimony, substantially complied with the requirements of 20 C.F.R. § 718.106. We assume without deciding that the ALJ properly considered the autopsy report. Even making this assumption, there is insufficient evidence to support the ALJ's finding that the lesions would have shown as opacities of greater than one centimeter. We thus reach neither the issue of whether substantial compliance with the regulation is sufficient nor the issue of whether evidence outside the autopsy report itself may be considered in determining whether the requirements of 20 C.F.R. § 718.106 are met.

the award of benefits to Mrs. Fultz and direct the Board to remand the case to an ALJ for further proceedings consistent with this opinion.[5]

*VACATED AND REMANDED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

The majority vacates the award of black lung benefits to the widow of Clarence Fultz, who died in 1999 after working as a coal miner for more than 30 years. I respectfully dissent.

It is conceded that Mrs. Fultz is entitled to survivor's benefits if her husband's death was "due to pneumoconiosis." The Black Lung Benefits Act provides an irrebuttable presumption of "death due to pneumoconiosis" if "a miner is suffering from a chronic dust disease of the lung" which:

> (A) when diagnosed by chest roentgenogram [x-ray], yields one or more large opacities (greater than one centimeter in diameter) . . ., (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is made by other means, would be a condition which could reasonably be expected to yield results described in clause (A) or (B) if diagnosis had been made in the manner prescribed in clause (A) or (B).

30 U.S.C.A. § 921(c)(3) (1986).[1] Circuit precedent requires that "the ALJ ma[ke] [an] equivalency determination" between the standards of

---

[5]The tenor of the dissent would suggest that this opinion precludes the miner's widow from obtaining benefits. To the contrary, we are remanding for the ALJ to make a factual finding based on testimony, medical reports or other evidence that the opacities would show as greater than one centimeter. Nothing in this opinion precludes the miner's widow from receiving benefits or precludes invocation of the irrebutable presumption based on an equivalency determination supported by substantial evidence.

[1]Such a condition "is commonly referred to as 'complicated' pneumoconiosis." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 757 n.3 (4th Cir. 1999).

prongs (A) and (B) of § 921(c)(3) — to assure that the "massive lesions" diagnosed by autopsy or biopsy under (B) would if contemporaneously x-rayed show an opacity of "greater than one centimeter" under (A). *Double B Mining, Inc. v. Blankenship*, 177 F.3d 240, 244 (4th Cir. 1999).

Here the ALJ made the required equivalency determination, finding that "the lesions found on autopsy, regardless of whether they exceeded 2 centimeters as Dr. Brooks found or were 1.2 centimeters as Dr. Caffrey found, would be expected on x-ray to yield one or more large opacities, (*i.e.*, greater than one centimeter in diameter)[.]" Nevertheless, the majority vacates the benefits award, asserting that no "substantial evidence" supports the ALJ's equivalency determination. I believe the majority seriously errs in doing so.

First, although the majority states the correct "substantial evidence" standard of review, it fails to apply that standard. A court reviewing an administrative decision to determine if it is supported by substantial evidence is not authorized to subject the decision to burdensome fly-specking. Rather, a court "*must* affirm" an ALJ's decision if, "in light of the whole record," the decision is supported by evidence of "sufficient quality and quantity 'as a reasonable mind might accept as adequate to support the finding under review.'" *Piney Mountain*, 176 F.3d at 756 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)) (emphasis added). Thus, "the Supreme Court has directed us to uphold decisions that rest within the realm of rationality; a reviewing court has *no license* to 'set aside an inference merely because it finds the opposite conclusion more reasonable or because it questions the factual basis.'" *Id.* at 756 (quoting *Doss v. Director, OWCP*, 53 F.3d 654, 659 (4th Cir. 1995) (internal quotation marks omitted)) (emphasis added). Unfortunately, however, even a quick review of the record evidence here demonstrates that the majority has appropriated for itself precisely such a "license."

The record reveals that Mrs. Fultz offered powerful evidence of lesions on Mr. Fultz's lungs resulting from coal-dust exposure, which exceeded not one, but two, centimeters. Dr. Brooks, who performed the autopsy of Mr. Fultz and diagnosed the cause of death as due, in part, to complicated pneumoconiosis, explained in detail that she found many — "too numerous to count" — large coal-dust lesions "in

excess of two centimeters." Dr. Brooks' autopsy report confirmed that "[a]nthracosis [wa]s severe" with "multiple areas of black macular discoloration," that "[t]he bronchi contain copious amounts of purulent material," and "multiple areas of fibrosis and firm nodules" were found in both lungs. Although the company's expert, Dr. Caffrey, disagreed with Dr. Brooks' ultimate conclusion (*i.e.*, that Mr. Fultz had complicated rather than "moderately severe" simple pneumoconiosis), he too found lesions on the autopsy slides exceeding one centimeter (albeit only lesions of 1.2, rather than two, centimeters). Moreover, when asked if there would be "enlargement or decrease in [the] size [of these lesions] on x-ray," Dr. Caffrey testified, "not that I know of," and while he also did not know whether the autopsy and x-ray measurements were "very likely" equivalent, he acknowledged that "it could be" "very possible that the 1.2 centimeter size [of autopsy lesions] could be the medical equivalent of a one centimeter measurement on x-ray." Relying on this evidence, the ALJ found that even Dr. Caffrey (the company's expert) "stated no basis for determining that the 1.2 centimeter lesions observed on the pathology slides would equate to less than the 1.2 centimeters on x-ray" and that the lesions on Mr. Fultz's lungs, whether 2 centimeters (Dr. Brooks' view) or 1.2 centimeters (Dr. Caffrey's view), "would be expected on x-ray to yield one or more large opacities . . . greater than 1 centimeter in diameter." Certainly, a "reasonable mind" could "accept" the record evidence as "adequate" to support this equivalency determination by the ALJ. *See Piney Mountain*, 176 F.3d at 756 (internal quotation marks omitted). Thus, proper application of the substantial evidence standard requires us to "uphold" the ALJ's decision. *Id.*

I confess that I do not fully understand the majority's refusal to do so. That refusal seems to stem from the majority's misunderstanding of the relevant law and from its unjustified disregard of crucial evidence.

As to the former, the majority appears to believe that, in order to establish equivalency, the law requires a claimant to offer evidence that a *medical professional*, rather than the ALJ, has made the equivalency determination. Thus, the majority rejects the ALJ's express equivalency determination because there was "no testimony or medical report or evidence indicating that the lesions discovered on autopsy would be expected on x-ray to yield one or more opacities of

greater than one centimeter." *Ante* at 5-6 n.1. Imposing a requirement that medical evidence contain the equivalency determination is, however, directly at odds with circuit precedent.

Indeed, when we first announced the equivalency requirement in *Double B Mining*, we made it plain that *the ALJ* is to make the equivalency determination. In that case, the miner's physician observed a nodule of 1.3 centimeters on biopsy of the miner's lung and opined that a nodule in excess of one centimeter indicated complicated pneumoconiosis; the company's expert contended that "complicated pneumoconiosis exists [only] where there are nodules on the lungs that are larger than two centimeters in greatest dimension." We expressly refused "to impose the two-centimeter rule on the Benefits Review Board," reasoning that the "statute d[id] not mandate" such a rule. *Id.* at 243. Instead, we held that because "nothing in the record . . . demonstrate[s] that *the ALJ made th[e] equivalency determination* as required by the statute," we would remand the case "*to the ALJ* to find whether the 1.3-centimeter lesion would, if x-rayed prior to removal of that portion of Blankenship's lung, have showed as a one-centimeter opacity." *Id.* at 244 (emphasis added); *see also id.* (concluding that *the ALJ* must make the "equivalency determination").

Thus, in *Double B Mining*, we emphasized that *the ALJ* is to make the necessary equivalency determination. Moreover, a year later in *Eastern Associated Coal Corp. v. Director, OWCP*, 220 F.3d 250, 254 (4th Cir. 2000), we *affirmed* an award of benefits even though *no* medical expert made an equivalency determination. In fact, we upheld the ALJ's determination in part because there was "no reason to believe" that autopsy evidence of nodules greater than one centimeter "would not produce x-ray opacities greater than one centimeter." *Id.* at 258. Yet the majority rejects the ALJ's similar reasoning here that nothing (not even the company doctor's testimony) indicates that autopsy evidence of nodules greater than one centimeter would not "equate" to x-ray opacities greater than one centimeter. The rationale for the majority's apparent imposition of a requirement that a medical expert make the equivalency determination is thus very puzzling.

Even more puzzling is the only other basis the majority offers for its refusal to find the ALJ's equivalency determination not supported by substantial evidence. That is, the majority's statement that

although "there may be lesions so large that it is self-evident that they would have shown as opacities greater than one centimeter on x-ray," such a "self-evident" conclusion is not possible here because it cannot be "presume[d] that lesions of *1.2 centimeters* are so large that there need be no further testimony or evidence as to whether they would have shown on x-ray as opacities greater than one centimeter." *Ante* at 8 (emphasis added) (footnote omitted). In arriving at this conclusion, the majority disregards Dr. Brooks' powerful testimony of numerous ("too many to count") lesions in excess of *two* (*not 1.2*) centimeters.[2] The majority's failure to consider this evidence is important because through it, Mrs. Fultz presented autopsy evidence of black lung lesions which *exceed* the apparent two-centimeter "gold standard" frequently advanced by the American College of Pathologists and employers as conclusively establishing complicated pneumoconiosis. *Cf. Double B Mining*, 177 F.3d at 243-44; *Piney Mountain*, 176 F.3d at 761 n.8. Surely such evidence suffices to meet the majority's own "self-evident" standard. Yet the majority completely rejects it.

In sum, despite Dr. Brooks' findings of multiple lesions greater than two centimeters, Dr. Caffrey's findings of lesions of at least 1.2 centimeters, and his concession that "it could be" "very possible" that such lesions are "the medical equivalent of a one centimeter measurement on x-ray," the majority concludes that the ALJ did not have substantial evidence to support her equivalency determination. Because this conclusion is based on a failure to apply the governing standard of review, an imposition of an unauthorized legal burden, and the disregard of record evidence, I must respectfully dissent.

---

[2]The majority critizes my reliance, in part, on Dr. Brooks' testimony. The ALJ clearly relied on this evidence, although she declined to resolve the differing opinions on the size of the lesions based on the undisputed findings of lesions of "at least 1.2 centimeter[s]."