UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CANNELTON INDUSTRIES,
INCORPORATED,

*Petitioner,*

v.

WILLIAM H. FRYE; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,

*Respondents.*

No. 03-1232

On Petition for Review of an Order
of the Benefits Review Board.
(98-693-BLA; 00-132-BLA; 02-299-BLA)

Argued: January 22, 2004

Decided: April 5, 2004

Before WILKINS, Chief Judge, and WIDENER and
MICHAEL, Circuit Judges.

---

Petition denied by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Paul Edwin Frampton, BOWLES, RICE, MCDAVID,
GRAFF & LOVE, P.L.L.C., Charleston, West Virginia, for Petitioner.
S. F. Raymond Smith, RUNDLE & RUNDLE, L.C., Pineville, West
Virginia, for Respondents. **ON BRIEF:** Susan W. Coffindaffer,

BOWLES, RICE, MCDAVID, GRAFF & LOVE, P.L.L.C., Charleston, West Virginia, for Petitioner.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Cannelton Industries, Inc. (Cannelton) petitions for review of a decision by the Benefits Review Board affirming an ALJ's award of benefits to William Frye under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq*. Because the ALJ committed no legal errors and because his decision is supported by substantial evidence, we deny the petition for review.

I.

William Frye worked as a welder for Cannelton, a coal mining company, for nearly thirty years. As a welder, Frye repaired mining machinery both underground and on the surface. He stopped working for Cannelton in January of 1980 after suffering a heart attack. Frye smoked five packs of cigarettes a week from 1944 to 1966.

Frye applied for federal black lung benefits for the first time in 1980. A claims examiner denied benefits in 1981 and Frye did not appeal the decision. Frye applied again in 1996 and requested an administrative hearing. Cannelton and Frye both appeared at the hearing and submitted evidence. On January 15, 1998, an Administrative Law Judge (ALJ) issued a 23-page opinion awarding Frye benefits. Cannelton appealed the award and the Benefits Review Board (BRB or Board) remanded the case to the ALJ, directing him to reconsider the medical opinion of Dr. Fino. On remand the ALJ reinstated Frye's benefits, but thereafter the BRB remanded the case a second time in light of an intervening opinion by our court that addressed the proper

method for weighing evidence under 20 C.F.R. § 718.202(a). *See Island Creek Coal Co. v. Compton*, 211 F.3d 203 (4th Cir. 2000).

The ALJ began his third decision by considering the x-ray evidence, which consisted of eleven chest x-rays that had been read a total of twenty-one times by eleven physicians. Frye's most recent x-ray was read positive for pneumoconiosis by three physicians and negative by one physician. The seventeen readings of older x-rays were all negative. However, most of these readings showed a profusion level of 0/1, which, although negative for pneumoconiosis, indicates some coal dust retention in the lungs. Based on these findings, the ALJ concluded that "the preponderance of the more probative chest x-ray evidence supports a finding of pneumoconiosis." J.A. 238. The ALJ also found that two CT chest scans conducted by Dr. Abramowitz were "tangentially supportive of a finding of pneumoconiosis." J.A. 245.

The ALJ next considered the conflicting medical reports of five physicians, only four of which are relevant here. Dr. Forehand examined Frye in 1995 and did not find any evidence of pneumoconiosis. Although a blood gas study revealed that Frye was totally disabled from hypoxemia, Dr. Forehand concluded that this pulmonary impairment was caused by smoking-induced bronchitis. Dr. Zaldivar, who examined Frye in 1996, found that Frye was suffering from asthma, coronary artery disease, and possibly cancer. Dr. Zaldivar administered his own blood gas study which, in contradiction to Dr. Forehand's study, indicated that Frye was not totally disabled by a pulmonary impairment. Dr. Zaldivar concluded that there was no evidence of pneumoconiosis. Dr. Fino did not examine Frye but reviewed his medical records. Dr. Fino concluded that Frye did not have pneumoconiosis. He based his diagnosis primarily on the negative x-ray evidence and on the improvement shown between Frye's 1995 blood gas study (conducted by Dr. Forehand) and his 1996 blood gas study (conducted by Dr. Zaldivar). Dr. Fino reasoned that this improvement was inconsistent with black lung, which is a progressive disease. Dr. Rasmussen reviewed the medical reports of Drs. Forehand and Zaldivar and the evaluations of the most recent chest x-ray. Dr. Rasmussen concluded that Frye was totally disabled and that coal mine dust was the most important factor in his impairment.

The ALJ credited the opinion of Dr. Rasmussen, discredited the opinions of Drs. Forehand, Zaldivar, and Fino, and concluded that Frye had established the existence of pneumoconiosis by a preponderance of the physician opinion evidence. In light of *Island Creek Coal* the ALJ then weighed all of the relevant evidence together and ruled that Frye qualified for black lung benefits. On January 23, 2003, over five years after the ALJ's initial award of benefits, the BRB affirmed. Cannelton petitions for review.

## II.

In order to obtain federal black lung benefits, a claimant must prove by a preponderance of the evidence that: (1) he has pneumoconiosis; (2) the pneumoconiosis arose out of his coal mine employment; (3) he has a totally disabling respiratory or pulmonary condition; and (4) pneumoconiosis is a contributing cause to his total respiratory disability. *Island Creek Coal*, 211 F.3d at 207. Cannelton argues that the ALJ and the BRB erred in concluding that Frye satisfied the first and fourth elements of his claim. On the first element, the company argues that the ALJ erred in: (1) weighing the x-ray evidence; (2) weighing the CT chest scan evidence; (3) crediting the opinion evidence of Dr. Rasmussen over Drs. Forehand, Zaldivar, and Fino as to whether Frye had pneumoconiosis. On the fourth element, the company argues that the ALJ erred in discrediting the opinions of Drs. Fino, Forehand, and Zaldivar as to whether pneumoconiosis was a contributing cause of Frye's respiratory disability.

We review the ALJ's application of the law de novo but we must affirm factual findings if they are supported by substantial evidence. *Thorn v. Itmann Coal Co.*, 3 F.3d 713, 718 (4th Cir. 1993).

## A.

We turn first to the x-ray evidence. Cannelton alleges that the ALJ committed four separate errors in analyzing the x-ray evidence, including: (1) treating negative chest x-rays as evidence of pneumoconiosis; (2) finding board certified radiologists to be better qualified to read x-rays than non-radiologist physicians; (3) assuming Frye's disease had progressed without citing any medical expert testimony

to that effect; (4) erroneously employing the "later is better rule." We find no error in the ALJ's analysis.

1.

We begin our discussion by conducting a more detailed review of the x-ray evidence presented in this case. The parties submitted twenty-one interpretations of eleven different x-rays. The ALJ initially concluded that two negative interpretations of an x-ray taken in 1981 were not probative based on their age. The ALJ then considered fifteen interpretations of nine different x-rays taken between 1988 and 1996. Although all fifteen of these interpretations were negative for pneumoconiosis, eleven were categorized as 0/1 and only four were read as 0/0. A 0/1 classification is "officially 'negative' for clinical pneumoconiosis but indicates the presence of some opacities, too few in number to constitute category 1 pneumoconiosis." N. LeRoy Lapp, A Lawyer's Medical Guide to Black Lung Litigation, 83 W. Va. Law Rev. 721, 729-30 (1981). Each of the physicians who classified their readings as 0/1 noted that Frye's x-ray showed abnormalities consistent with pneumoconiosis and indicated the presence of opacities in some or most zones of Frye's lungs. J.A. 205 n.5. The ALJ found the eleven 0/1 readings, which were all conducted by radiologists, more probative than the 0/0 readings, which were conducted by non-radiologists, whom the ALJ considered to be less qualified. The ALJ concluded that "the substantial preponderance of the x-ray evidence through 1996 shows the presence of opacities. While they are not sufficient in number to yield a positive interpretation for pneumoconiosis, this consistent interpretation . . . sets the foundation for the second factor." J.A. 238. The ALJ then considered four interpretations of the most recent chest x-ray, three of which were positive for pneumoconiosis. The single negative reading was again conducted by a lesser qualified non-radiologist. The ALJ concluded that:

> The weight of the more qualified medical authority leads to the determination that the March 17, 1997 x-ray is positive for pneumoconiosis. Then, in light of the fact that the x-ray history from 1988 through 1996 showed the existence of opacities and considering the progressive nature of pneumoconiosis, I find the positive March 1997 x-ray demonstrates that Mr. Frye has developed the black lung disease.

J.A. 238.

2.

Cannelton first argues that the ALJ's analysis directly violated 20 C.F.R. § 718.102(b), which states that "a 0/1 . . . classification does not constitute evidence of pneumoconiosis." The ALJ would have committed clear error if he had concluded that the 0/1 readings themselves demonstrated that Frye had pneumoconiosis. However, in this case the ALJ specifically recognized that although the 0/1 readings "show[ed] the presence of opacities . . . they [were] not sufficient in number to yield a positive interpretation for pneumoconiosis." J.A. 238. Therefore it cannot be said that he used the 0/1 readings as evidence of pneumoconiosis. Rather, he used the readings to weigh the reliability of the later positive readings. Because there were some opacities in the lung in the readings taken between 1988 and 1996, and because black lung is a progressive disease, the ALJ ruled that "the positive March 1997 x-ray demonstrates that Mr. Frye has developed the black lung disease." J.A. 238. The Board has concluded on multiple occasions that this analysis is appropriate, *see, e.g.*, *Delung v. Milburn Colliery Co.*, BRB No. 02-0124; *Frye v. Cannelton Industries, Inc.*, BRB No. 98-0693, and we agree that it is.

Cannelton next argues that it was error for the ALJ to accord greater weight to the x-ray interpretations conducted by radiologists over interpretations offered by other types of physicians because "the record contains no medical opinion that a board certified radiologist . . . has better qualifications than [other types of specialists]." Petitioner's Brief at 22. This argument has little merit. The black lung regulations state that "where two or more X-ray reports are in conflict, in evaluating such X-ray reports consideration shall be given to the radiological qualifications of the physicians interpreting the X-rays." 20 C.F.R. § 718.202(a)(1). A radiologist is a "specialist in the use of . . . x-rays . . . in the diagnosis or treatment of disease." Webster's Third New International Dictionary 1873 (1993). Thus, by definition, a radiologist is more qualified in the practice of reading x-rays than other types of specialists. The regulations recognize this by giving special deference to the opinions of radiologists. For example, 20 C.F.R. § 718.102(c) states that "if the physician interpreting the film is a Board-certified or Board-eligible radiologist . . . he or she shall

so indicate." *See also* 20 C.F.R. § 718.202(a)(1)(i) ("A Board-certified . . . radiologist's interpretation of a chest x-ray shall be accepted by the Office if . . . such x-ray has been taken by a radiologist."); 20 C.F.R. § 718.102(e). The ALJ committed no error in treating radiologists as more qualified in reading x-rays than other types of physicians. *See, e.g.*, *Zeigler Coal Co. v. Kelley*, 112 F.3d 839, 842-43 (7th Cir. 1997) (affirming award of benefits where "the ALJ . . . explained that, pursuant to Benefits Review Board precedent, he credited the x-ray reading made by Dr. Brandon, a board certified radiologist and B-reader, over the reading made by Dr. Renn, who although a B-reader, is not certified in radiology").

Cannelton also argues that the ALJ erred by finding that Frye's disease had progressed without citing to any medical testimony supporting that finding. This argument "ignores the assumption of progressivity that underlies much of the statutory regime." *E. Associated Coal Corp. v. Director, O.W.C.P.*, 220 F.3d 250, 258 (4th Cir. 2000). The regulations specifically state that "'pneumoconiosis' is recognized as a latent and progressive disease." 20 C.F.R. § 718.201(c). In this case, the ALJ inferred that Frye's condition had progressed because his latest x-ray was positive for pneumoconiosis and earlier x-rays showed the presence of opacities that were consistent with pneumoconiosis, but too few in number to qualify as a positive diagnosis. As stated by the Seventh Circuit, "once [the claimant] introduced the [later positive x-ray], he had put before the ALJ concrete evidence that *his* simple pneumoconiosis had progressed." *Peabody Coal Co. v. Spese*, 117 F.3d 1001, 1009 (7th Cir. 1997).

Furthermore, if we accepted Cannelton's argument on this issue, we would effectively be abandoning the "later is better rule," which allows ALJs to discount old test results or physical examinations in favor of subsequent results that reveal deterioration of the miner's condition. The rationale of the rule is that "pneumoconiosis is a progressive disease . . . therefore, a later test or exam is a more reliable indicator of the miner's condition than an earlier one." *Adkins v. Director, O.W.C.P.*, 958 F.2d 49, 51 (4th Cir. 1992). Under Cannelton's argument, the rule, which takes progressivity as a given, could only be applied if a "physician . . . provided an opinion that progression had occurred" in the specific case being examined. Petitioner's Brief at 23. The "later is better" rule has been endorsed by the

Supreme Court, *Mullins Coal Co., Inc. of Va. v. Director, O.W.C.P.*, 484 U.S. 135, 151-52 (1987), and repeatedly upheld by this circuit, *see E. Associated Coal*, 220 F.3d at 258-59. We are bound by these decisions, and we therefore reject Cannelton's argument.

Finally, Cannelton argues that the "later is better rule" should not have been applied in this case because only five months passed between the taking of the latest negative x-ray and the most recent positive x-ray. Our circuit has recognized that in certain situations "a bare appeal to 'recency' is an abdication of rational decisionmaking." *Thorn*, 3 F.3d at 718 (rule improperly applied where five physicians examined claimant in five month period and ALJ based recentness on when reports were prepared rather than when examinations occurred). *See also Adkins*, 958 F.2d at 52 (where later evidence indicates that claimant's condition has *improved*, rule's logic "simply cannot apply"). However, in this case the rule "was not imposed mechanically or arbitrarily, but was applied in the context of a record in which the later x-rays were not inconsistent with the earlier ones." *E. Associated Coal*, 220 F.3d at 259. Furthermore, in this case it is not even clear that the ALJ employed the "later is better rule." Typically, the rule is used to discredit the accuracy of older x-rays in light of later x-rays. The ALJ did not do that in this case. Instead, he found that the later positive x-rays were especially reliable because the earlier x-rays, although negative, consistently demonstrated opacities in the lung. As stated by the Benefits Review Board, "the administrative law judge's finding that the trend of the x-ray evidence showed the development of pneumoconiosis is not irrational in light of the references to the presence of opacities consistent with pneumoconiosis in the x ray reports classified as 0/1 and the progressive nature of pneumoconiosis." J.A. 205. In the circumstances presented, we find no error in the ALJ's analysis.

## B.

Cannelton's second argument is that the ALJ erred in his treatment of two CT chest scans conducted by Dr. Abramowitz. Dr. Abramowitz concluded that a 1996 CT chest scan of Frye showed evidence of a "nonspecific interstitial lung disease." J.A. 244. When Dr. Abramowitz looked at a second CT scan taken in 1997, he found a "generalized increase in interstitial markings throughout the lung."

J.A. 244. The ALJ ruled that these findings were "tangentially supportive of a finding of pneumoconiosis." J.A. 245. Cannelton alleges that the ALJ "substitut[ed] his own medical opinion for that of the physician" because Dr. Abramowitz never said that the scans showed pneumoconiosis. Petitioner's Brief at 30. We disagree.

The ALJ did not state that the CT chest scans demonstrated the presence of pneumoconiosis. He merely stated that the scans were "tangentially supportive" of a finding of pneumoconiosis. Pneumoconiosis is a type of interstitial lung disease. *See, e.g.*, *Doss v. Director, O.W.C.P.*, 53 F.3d 654, 656 (4th Cir. 1995). "Tangential" is defined as "touching lightly or in the most tenuous way." Webster's Third New International Dictionary 2337 (1993). Therefore, we take the ALJ's comments to mean that because the CT chest scans showed some type of interstitial disease, of which pneumoconiosis is an example, they were consistent with a diagnosis of pneumoconiosis. Furthermore, the ALJ surmised that the increased interstitial markings shown on the later scan supported a finding that Frye's pulmonary condition had grown worse. This is a reasonable interpretation of the evidence that the ALJ, as factfinder, was entitled to make.

### C.

Cannelton next argues that the ALJ erred in determining the existence of pneumoconiosis when he discredited the medical opinions of Drs. Forehand, Zaldivar, and Fino and credited the opinion of Dr. Rasmussen. Because the ALJ's determinations were supported by substantial evidence, we find no error. "In reviewing this material, we note that it is the province of the ALJ to evaluate the physicians' opinions. As trier of fact, the ALJ is not bound to accept the opinion or theory of any medical expert." *Island Creek Coal*, 211 F.3d at 211 (citations omitted). Furthermore, a court need not address every argument that the ALJ erred in discrediting a physician's opinion. It need only determine that "that there was sufficient factual basis to support one reason for discrediting each opinion." *Id.* at 213 n.13. With those principles in mind, we turn to the physician opinions.

### 1. *Dr. Forehand.*

The ALJ discredited Dr. Forehand's assessment on the existence of pneumoconiosis because he focused only on medical rather than legal

pneumoconiosis. Medical pneumoconiosis is "a particular disease of the lung generally characterized by certain opacities appearing on a chest x-ray." *Id.* at 210. Legal pneumoconiosis encompasses a much broader category of diseases, including "any chronic pulmonary disease resulting in respiratory or pulmonary impairment significantly related to or substantially aggravated by, dust exposure in coal mine employment." 20 C.F.R. § 718.201(b). As our circuit has said:

> A medical diagnosis finding no coal workers' pneumoconiosis is not equivalent to a legal finding of no pneumoconiosis . . . . Evidence that does not establish medical pneumoconiosis, e.g., an x-ray read as negative for coal workers' pneumoconiosis, should not necessarily be treated as evidence weighing *against* a finding of legal pneumoconiosis.

*Island Creek Coal,* 211 F.3d at 210. Dr. Forehand concluded that although Frye was suffering from a totally disabling form of bronchitis, Frye's negative chest x-rays, coupled with Frye's history of cigarette smoking, established that the bronchitis was due solely to cigarette smoke. The ALJ ruled that "Dr. Forehand reached that conclusion without explaining how he eliminated Mr. Frye's nearly thirty years of exposure to coal mine dust as a possible cause of Mr. Frye's bronchitis." J.A. 247. In other words, Dr. Forehand erred by assuming that the negative x-rays necessarily ruled out the possibility that his bronchitis was caused by coal mine dust, which would constitute a form of legal pneumoconiosis. The ALJ's decision was a direct application of the principles cited above and supported by facts in the record. The ALJ committed no error in discrediting Dr. Forehand's opinion.

### 2. *Dr. Zaldivar.*

The ALJ discredited Dr. Zaldivar's opinion, in part because he "went to great lengths to alter the meaning of test results that didn't support his decision." J.A. 246. Dr. Zaldivar concluded that Frye was not totally disabled by a pulmonary condition. In his deposition, Dr. Zaldivar was asked to explain the 1995 blood gas test conducted by Dr. Forehand that, under the applicable regulations, indicated that Frye was totally disabled. Dr. Zaldivar stated that "the blood gases obtained by [Dr. Forehand] are not disabling anyway, and would

allow [Frye] to perform arduous labor." J.A. 243. Dr. Zaldivar went on to explain that although "a p02 in the 60s is not normal at sea level . . . Dr. Forehand's tests [were conducted at] . . . 2000 feet above sea level, and at that point the p02 is normal." J.A. 100-01. Both of these statements plainly contradict federal regulations. Under the table contained in Appendix C of 20 C.F.R. § 718, Frye's 1995 blood gas study results indicate that he is presumed to be totally disabled. J.A. 239 n.21-22. Yet Dr. Zaldivar's comments show that he presumed just the opposite. The federal regulations also demonstrate that an elevation of 2000 feet does not affect the results of a blood gas study. *See* 20 C.F.R. § 718, Appendix C (noting that "A miner who meets the following medical specification shall be found to be totally disabled . . . (1) For arterial blood gas studies performed *at test sites up to 2,999 feet above sea level* . . .) (emphasis added). Because Zaldivar's analysis disregarded the plain language of the regulations, there is "a sufficient factual basis to support one reason for discrediting [Zaldivar's] opinion." *Island Creek Coal*, 211 F.3d at 213 n.13.

### 3. *Dr. Fino.*

The ALJ discounted the opinion of Dr. Fino because he used an unreliable 1996 blood gas study to "explain away the possibility of pneumoconiosis." J.A. 246. The 1996 blood gas study, which was conducted by Dr. Zaldivar, showed an improvement in Frye's condition compared to the 1995 blood gas study conducted by Dr. Forehand. Fino reasoned that because the two studies indicated that Frye's pulmonary condition had improved, and because black lung is progressive in nature, Frye could not have pneumoconiosis. However, the ALJ discredited Dr. Zaldivar's 1996 blood gas test in favor of Dr. Forehand's 1995 study because Dr. Zaldivar's test did not conform to the requirements of 20 C.F.R. § 718.105. J.A. 239-40. The regulations in place at the time of the 1996 blood gas study stated that "any report of a blood gas study submitted in connection with a claim shall specify . . . (2) Altitude . . . at which the test was conducted; . . . (8) Pulse rate at the time the blood sample was drawn; . . . (10) Whether equipment was calibrated before and after each test." 20 C.F.R. § 718.105 (1995). Dr. Zaldivar's test failed to include each of these items. Therefore, the ALJ discredited Dr. Fino's report because it was based, in part, on Dr. Zaldivar's non-conforming blood gas study.

Cannelton argues that the ALJ erred in rejecting the 1996 test based solely on the fact that it did not conform to 20 C.F.R. § 718.105. Cannelton contends that the standards listed in the regulations "should be used as guidelines by the ALJ . . . but are not mandatory." Petitioner's Brief at 39. This argument is in tension with the plain language of the regulations, which state that arterial blood gas test results "*shall* specify" certain information. 20 C.F.R. § 718.105 (1995) (emphasis added). There is also evidence in the federal register that casts doubt on Cannelton's position. In comments accompanying the federal regulations, the Department of Labor stated that "the Department is of the opinion that the reporting requirements listed in the regulations constitute the minimum requirements necessary in order to ascertain the validity of the tests conducted." *Director, O.W.C.P. v. Mangifest*, 826 F.2d 1318, 1327 n.16 (3d Cir. 1987) (citing 45 Fed.Reg. 13682 (1980)). Even if we assume that Cannelton's statement of the law is correct, the ALJ still did not err in this case. The ALJ essentially looked to the requirements in § 718.105 to determine the weight that he should assign to two conflicting medical tests. Because the 1996 blood gas study did not conform to the regulations, he deemed it less probative than the 1995 blood gas study. At the very least, the quality standards embodied in § 718.105 identify the types of information that are indicative of a reliable arterial blood gas test. We find it entirely reasonable for an ALJ, as trier of fact, to discount medical tests that lack the quality indicators listed in the federal regulations. *See id.* at 1326 (noting that 20 C.F.R. § 718.206 "delegate[s] discretion to the ALJ to determine the weight to which a doctor's opinion is entitled under all the facts of the case"). Likewise, it is reasonable for an ALJ to discount opinions that are themselves premised on discredited medical tests. This weighing of the evidence falls within the province of the ALJ. We conclude that there was substantial evidence to discredit Dr. Fino's medical opinion.

### 4.  *Dr. Rasmussen.*

The ALJ concluded that Dr. Rasmussen's opinion was well reasoned. Cannelton disagrees, arguing that Dr. Rasmussen's report was not well reasoned because he "does not list or make any mention of the arterial blood gas test of 1996." Petitioner's Brief at 43. However, as we just stated, the ALJ reasonably discredited the 1996 blood gas test. The failure of a physician to consider or reference a non-

probative medical test does not mean his report was poorly reasoned. It was therefore appropriate for the ALJ to credit Dr. Rasmussen's report.

D.

Cannelton's fourth argument is that the ALJ erred in determining that Frye's total disability was caused by pneumoconiosis because the ALJ improperly discredited the opinions of Drs. Fino, Forehand, and Zaldivar on the issue of causation. We disagree.

The ALJ ruled that "[Dr. Fino's and Dr. Forehand's] opinions on whether pneumoconiosis contributed to Mr. Frye's total disability carry little probative weight" because "[they both] concluded Mr. Frye did not have pneumoconiosis." J.A. 248. Our circuit has held that when a physician fails to diagnose pneumoconiosis, an ALJ may properly discount that physician's opinion on causation if it is "premised . . . on an erroneous finding contrary to the ALJ's conclusion." *Island Creek Coal*, 211 F.3d at 213. As we explained above, Dr. Fino concluded that Frye's condition could not have been caused by pneumoconiosis, which is permanent and progressive, because Frye's pulmonary disability improved between the 1995 arterial blood gas test and the 1996 blood gas test. However, the ALJ rejected the probative value of the 1996 test. Therefore, Dr. Fino's causation analysis, which relied on the 1996 test, was "irreconcilable with the ALJ's findings." *Id.* at 214. Meanwhile, Dr. Forehand concluded that Frye's pulmonary condition was not caused by pneumoconiosis because his chest x-rays were negative. But the ALJ concluded the radiological evidence was positive. Thus, Dr. Forehand's causation analysis was clearly "premised . . . on an erroneous finding contrary to the ALJ's conclusion." *Id.* at 213.

The ALJ discredited Dr. Zaldivar's causation opinion because Dr. Zaldivar "opined Mr. Frye did not have a total respiratory disability," J.A. 248, and because "he also did not find Mr. Frye totally disabled by a respiratory impairment," J.A. 248 n.41. Cannelton argues that degree of respiratory impairment and cause of impairment are two separate things. In other words, Dr. Zaldivar's finding that Frye was not totally disabled by a pulmonary impairment does not necessarily undermine his findings as to what was causing the non-disabling con-

dition. This argument does not meet the ALJ's decision head-on. The ALJ stated that Dr. Zaldivar did not find a total respiratory disability *and* did not find Frye to be totally disabled. Thus, Dr. Zaldivar misdiagnosed the *type* of respiratory disability and the *level* of Frye's disability. Cannelton's argument only goes to the level of disability. Because Dr. Zaldivar does not believe Frye has a total respiratory disability, he, in effect, has no opinion on what caused the total respiratory disability, and therefore his causation analysis is worthy of little weight. The ALJ's reasoning was sufficient to discredit Dr. Zaldivar's causation analysis.

### III.

We agree with the Benefits Review Board that the ALJ made no error of law, that his findings of fact are supported by substantial evidence in the record as a whole, and that William Frye qualifies for black lung benefits. Accordingly, we deny Cannelton Industries' petition for review.

*PETITION DENIED*