**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARTHA JANE PERRY, survivor of
George Perry,
*Petitioner,*

v.

MYNU COALS, INCORPORATED/Hobet
Mining Company; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
*Respondents.*

No. 05-1651

On Petition for Review of an Order
of the Benefits Review Board.
(04-694-BLA)

Argued: January 31, 2006

Decided: November 20, 2006

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

---

Petition for review granted; order vacated and remanded with instructions by published opinion. Judge Widener wrote the majority opinion, in which Judge Motz concurred. Judge Williams wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Leonard Joseph Stayton, Inez, Kentucky, for Petitioner. Jeffrey Steven Goldberg, UNITED STATES DEPARTMENT OF

LABOR, Office of the Solicitor, Washington, D.C., for Respondent Director, Office of Workers' Compensation Programs. Christopher Michael Hunter, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Respondent MYNU Coals, Incorporated/Hobet Mining Company. **ON BRIEF:** Howard M. Radzely, Solicitor of Labor, Christian P. Barber, Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director, Office of Workers' Compensation Programs. Douglas A. Smoot, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Respondent MYNU Coals, Incorporated/Hobet Mining Company.

---

**OPINION**

WIDENER, Circuit Judge:

The issue in this case is whether George Perry, petitioner Martha Jane Perry's husband, died due to pneumoconiosis (Black Lung disease). The Administrative Law Judge, rejecting Mrs. Perry's evidence, held that Mr. Perry's pneumoconiosis was not proven complicated and, therefore, a statute and regulation creating an irrebuttable presumption of causation did not apply. The Benefits Review Board affirmed. Mrs. Perry questions the ALJ's reasons for rejecting the opinions of the doctors who testified that Mr. Perry had complicated pneumoconiosis that caused his death. The federal respondent, the Director of the Office of Workers' Compensation Programs, joins Mrs. Perry, at least so far as vacation and remand go, arguing specifically that the doctors' testimony was sufficient to trigger the irrebuttable presumption of causation codified in 20 C.F.R. § 718.304 and 30 U.S.C. § 921(c)(3). We grant the petition and remand for an award of benefits.

I.

A.

Our summary of the medical evidence and the ALJ's holding will benefit from a general understanding of the difference between simple and complicated pneumoconiosis.

In the explanation adopted by the ALJ, Dr. David Rosenberg, one of Mynu Coals' witnesses, summarized the difference as follows:

> [S]imple coal workers' pneumoconiosis . . . is where you have micronodules that are discrete and that have not come together into a conglomerate mass. The micronodules, as a B reader, you categorize the various micronodules into different categories of "p," "q" and "r," and "r" would be up to 10 millimeters in diameter. In simple CWP . . . one can see that these micronodules are discrete and have not come together in a conglomerate mass.
>
> With complicated CWP, what happens is that these individual micronodules fuse together and the body forms an immunologic reaction where tissue is destroyed within these conglomerate masses. One gets necrosis or destruction, liquefaction of tissue. One loses all structure, and it becomes a completely destroyed homogeneous mass of tissue within. And this is quite common in complicated CWP. And one sees anthracotic pigment that's dispersed throughout this necrotic mass of tissue.
>
> [B]asically the difference between simple and complicated disease is the absence of discrete micronodules in the complicated disease as the micronodules come together.

Another of Mynu Coals' experts, Dr. Richard Naeye, was of a slightly different view. He testified that complicated pneumoconiosis is not a fusion of simple nodules, but a different etiology.

In either case, it is agreed that the size of the mass and the extent of tissue destruction are considerations. This leads us to the Supreme Court's description of the two types of pneumoconiosis, which, of course, we follow: "[s]imple pneumoconiosis . . . is generally regarded by physicians as seldom productive of significant respiratory impairment" whereas "[c]omplicated pneumoconiosis, generally far more serious, involves progressive massive fibrosis [and] usually produces significant pulmonary impairment and marked respiratory disability, [which] may induce death by cardiac failure, and may contribute to other causes of death." *Usery v. Turner Elkhorn Mining*

*Co.*, 428 U.S. 1, 7 (1976) (citing Surgeon General's report). Some doctors in this case — Drs. Naeye and Rosenberg — contradicted slightly this generalization, for example by testifying that simple pneumoconiosis can impair lung function, but they concurred that complicated pneumoconiosis has "increased morbidity."

With this background, we turn to the facts.

### B.

George Perry worked primarily as a bulldozer operator at a strip mine, and in a few other mining positions, for 42 years. He was forced to retire in 1975 due to having failed a physical, which Mr. Perry attributed to his pneumoconiosis. In addition to his mining work, Mr. Perry smoked 1.5 to 2 packs of cigarettes per day for 35 or 40 years, though he stopped smoking at about the time he retired 30-some years ago. In 1992, Mr. Perry had a successful heart-bypass operation. At least one physician seeing Mr. Perry for a surgical follow-up in August 1992 noted a "history of coal workers pneumoconiosis," though the basis for this notation is unstated.

In late 2000, in the months before he died, Mr. Perry was taken to the hospital several times after experiencing trouble breathing. Mrs. Perry testified before the ALJ that her husband was constantly on oxygen. On January 10, 2001, Mr. Perry was again taken by ambulance to the hospital for such breathing problems. There he received oxygen for his breathing problems, but he died a few days later, on January 13. The death certificate identifies acute cardiopulmonary renal failure as the immediate cause of his death; and it lists coronary artery disease, chronic obstructive pulmonary disease (COPD), and chronic renal failure as contributing causes.

### C.

Mrs. Perry filed a timely claim for survivor's benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.*, and its implementing regulations, 20 C.F.R. Parts 410, 718, and 727. Following a proposed decision and award of benefits by the Director, Mynu Coals objected and requested a hearing, which was granted. The record prin-

cipally consists of the reports and deposition testimony of various doctors, described below.

After Mr. Perry's death, an autopsy was performed by Dr. Paul F. Mellen. Dr. Mellen is board certified in the anatomic, clinical, and forensic branches of pathology; he was at the time employed by the Charleston Area Medical Center and also served as a clinical professor of pathology at the University of West Virginia. Dr. Mellen testified that he had performed "a hundred or so" autopsies to evaluate for pneumoconiosis. Dr. Mellen's description of how he diagnosed complicated pneumoconiosis was consistent with its defining characteristics: he looked for "aggressive massive fibrosis or coal nodules," relying on whether a gross exam revealed anthracosis (blackening), scarring, and "on dissection, black nodules measuring at least . . . two centimeter[s]" in diameter. Dr. Mellen acknowledged that anthracosis does not necessarily mean fibrosis, nor are pigmentation and size sufficient; rather, "the usual gross appearance" and "significant lung fibrosis" are necessary.

Dr. Mellen's autopsy report concluded that Mr. Perry suffered from complicated pneumoconiosis in both lungs, mild COPD, and cancer in the right lung. The diagnosis of complicated pneumoconiosis rested on "marked anthracosis with advanced associated scarring of both upper lobes." This was confirmed by a gross viewing as well as microscopic. The nodules were not X-rayed. Consistent with his report, Dr. Mellen's testimony suggested, though not in so many words, that Mr. Perry's death was caused by complicated pneumoconiosis. More specifically as to the diagnosis, Dr. Mellen determined that a 4-centimeter nodule in the right lung was a mixture of pneumoconiosis and cancer, and a 6-centimeter nodule in the left lung was complicated pneumoconiosis, or as he otherwise characterized it, "coal dust with fibrosis." Dr. Mellen's conclusions were based on his gross viewing of the lungs and confirmed by microscopic slides. This was the testimony in support of Mrs. Perry.[1]

---

[1]Dr. Perper's report issued after the hearing and after Mynu Coals' reports had been submitted. Mynu Coals' experts then submitted letters explaining why their opinions did not change.

Several doctors testified or issued reports contrary to Dr. Mellen's to the effect that pneumoconiosis did not cause Mr. Perry's death. Since the claim of error in this case concerns the ALJ's reasons for rejecting Dr. Mellen's conclusions, which did not rest on these doctors' views, we briefly summarize this evidence. Dr. Everett Oesterling, Jr., and Dr. Richard Naeye opined that pneumoconiosis did not contribute to the decedent's death, but that death was attributable respectively to arteriosclerosis and cancer. Dr. Oesterling found moderately severe pneumoconiosis but determined that it did not impair Mr. Perry's pulmonary function. Dr. Naeye opined that the silica crystals in Mr. Perry's lungs—at least as reflected on the slides he reviewed—were not toxic and that there was insufficient black pigmentation and necrosis for a diagnosis of complicated pneumoconiosis. Dr. David Rosenberg and Dr. W.K.C. Morgan, both board-certified specialists and B-readers, also attributed death to a cause other than pneumoconiosis, variously pulmonary edema with coronary artery disease, renal failure, and cancer. Dr. Morgan thought it significant that Mr. Perry had worked most of his career aboveground, meaning that the dust he was exposed to would not have been coal dust.[2]

The ALJ summarized this evidence and found Mynu Coals' experts to be more credible than Dr. Perper, though he "ranked equally" the various physicians. But, apparently owing to Dr. Mellen's status as the autopsy prosector, he treated and rejected Dr. Mellen's views on three grounds unrelated to Mynu Coals' doctors: (1) that Dr. Mellen's statements with respect to the composition of the 4- and 6-centimeter nodules and with respect to what size they would have been on an X-ray were "equivocal"; (2) Dr. Mellen's unfamiliarity with Mr. Perry's smoking history; and (3) Dr. Mellen's failure to identify pneumoconiosis as a cause of death.

Mrs. Perry appealed to the Benefits Review Board, which affirmed the denial of benefits on the same grounds as did the ALJ.

---

[2]We note, however, that below-ground work is not necessary for coal dust or recovery under the Black Lung statutes. See *Norfolk & Western Ry. Co. v. Roberson*, 918 F.2d 1144, 114850 (4th Cir. 1990), *Roberts v. Weinberger*, 527 F.2d 600, 602 (4th Cir. 1975).

## II.

We review the findings of fact to determine whether they are supported by substantial evidence, and the legal conclusions *de novo*. See *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 207-08 (4th Cir. 2000). As fact-finder, the ALJ must consider and weigh all the evidence presented. See 211 F.3d at 208-09. And the ALJ must explain which evidence is relevant and why he credited the evidence he did. See *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439 (4th Cir. 1997).

In addition to these familiar standards, our decision is framed by the Black Lung Benefits Act's implementing regulations. A pneumoconiosis death benefits claimant must prove that a decedent died as a result of the disease. See 20 C.F.R. §§ 718.1 & 718.205(a).[3] This means that the claimant must establish that the decedent had coal workers' pneumoconiosis as defined by the Act, 20 C.F.R. § 718.202, that the disease arose from coal mine employment, 20 C.F.R. § 718.203, and that death was due to pneumoconiosis, 20 C.F.R. § 718.205. See *Shuff v. Cedar Coal Co.*, 967 F.2d 977, 980 (4th Cir. 1992).

As the ALJ observed, all the physicians in this case agreed that Mr. Perry had some form of pneumoconiosis, so Mrs. Perry satisfied her burden of proof on the existence of the disease. The ALJ also held that Mr. Perry's pneumoconiosis was presumptively caused by his mine employment, a finding not challenged by Mynu Coals. Accordingly, the first two elements of recovery are not at issue.

What is contested is the element of causation. By regulation, there are three ways to prove it. See 20 C.F.R. § 718.205(c). The first two are if (1) "competent medical evidence establishes that pneumoconiosis was the cause of the miner's death," or (2) "pneumoconiosis was a substantially contributing cause or factor *leading to the miner's death or where the death was caused by* complications of pneumoco-

---

[3]Mrs. Perry also had to show, and showed, that: (1) she was a surviving dependent of Mr. Perry, 20 C.F.R. § 718.1; (2) Mr. Perry was a coal miner, 20 C.F.R. § 725.202; and (3) that Mynu Coals was a responsible operator, 20 C.F.R. § 725.491-.495.

niosis." 20 C.F.R. § 718.205(c)(1 & 2) (emphasis added). These are essentially codifications of ordinary standards of proof, though the latter shifts the burden somewhat in that pneumoconiosis qualifies if "it hastens the miner's death." *Id.* § 718.205(c)(5). In light of the medical differences between the two forms of pneumoconiosis, which form afflicted Mr. Perry is relevant to whether the disease was capable of causing, and whether it actually caused, his death under either method.

The third method, our main concern here, is the irrebuttable presumption of causation created by statute and regulation. See 30 U.S.C. § 921(c)(3) and 20 C.F.R. § 718.205(c)(3); see also *E. Assoc. Coal Co. v. Dir., OWCP*, 220 F.3d 250, 255 n.1 (4th Cir. 2000) (noting virtual identity between the statute and regulation). Specifically, the presumption attaches if pneumoconiosis,

> (a) When diagnosed by chest X-ray . . . yields one or more large opacities (greater than 1 centimeter in diameter) and would be classified in Category A, B, or C in [one of 3 classification systems] . . . [or]

> (b) When diagnosed by biopsy or autopsy, yields massive lesions in the lung; or

> (c) When diagnosed by [other] means . . . would be a condition which could reasonably be expected to yield the results described in paragraph (a) or (b) of this section had diagnosis been made as therein described . . . .

20 C.F.R. § 718.304. Thus, by statute or regulation, an opacity of sufficient size—if X-rayed, one centimeter; if not, one that is "massive"—becomes a proxy for the tissue mass characteristic of complicated pneumoconiosis. See *E. Assoc. Coal Corp.*, 220 F.3d at 255 (referring to this as "statutory complicated pneumoconiosis").

### III.

The ALJ's failure to apply the presumption of causation on the basis of Dr. Mellen's testimony wrongly confused the presumption

with the other methods of proving death due to complicated pneumoconiosis. The ALJ's single-sentence rejection of the presumption illustrates this conceptual error: "Because I find that complicated pneumoconiosis was not established, criterion (3) is not met." (JA 439) Criterion (3) refers to the presumption of complicated pneumoconiosis. This same mistake is repeated in the opinion of the Board, as it affirms the ALJ's finding that Mrs. Perry has not established the evidence of complicated pneumoconiosis. Of course, the decision of the ALJ, as repeated by the Board, is simply wrong. It does not address the necessary premises of the statutory presumption but only finds that since the conclusion was not otherwise proven, the presumption is not effective. The Director of Workers' Compensation has caught this error. He takes the position that the evidence in this case is sufficient to prove that opacities greater than 1 cm in diameter would have been shown by X-ray had X-rays been made so that the presumption in 30 U.S.C. § 921(c)(3) would apply. Also, we note, without contradiction, that the prosector of the autopsy, Dr. Mellen, described massive lesions in both lungs, another statutory ground for application of the presumption. Specifically, Dr. Mellen's autopsy report contains a notation of "multiple jet black nodules measuring up to 4 cm" in the upper part of the miner's right lung. Dr. Mellen further describes a similar nodule measuring 6 cm in the upper left lung. Dr. Mellen contrasts these findings with the follow-up observation that the lower portions of the miner's lungs are "densely anthracotic *without mass lesions*." (Emphasis added.) These determinations by the prosector are relevant evidence which may only lead one to conclude that massive lesions were present in the upper part of the lungs sufficient to trigger the presumption under (b) of 20 C.F.R. § 718.304.[4]

---

[4]The Director does not rely on this finding. We think any such absence is too glaring to omit.

The final anatomical diagnosis in the autopsy pathology report itself includes:

"Complicated coal worker type pneumoconiosis:

Advanced anthracosis with marked
Fibrosis of both upper lobes (progressive massive fibrosis)."

And the Clinical-Pathological Summary provides in part:

"[Coal worker type pneumoconiosis, complicated type, with progressive massive fibrosis.]"

Put simply, both the ALJ and the Board have required the plaintiff to otherwise prove that the miner suffered from complicated pneumoconiosis. And for that reason, they find that the statutory presumption would not apply. Correctly what the plaintiff needed to prove were the premises of the presumption and, if proven, the statute provides the irrebuttable presumption of complicated pneumoconiosis.

Furthermore, Dr. Mellen's testimony supports the irrebuttable presumption under (a) of 20 C.F.R. § 718.304 on the basis of the size of the nodules found in the miner's lungs. Dr. Mellen testified that the fibrous masses were four and six centimeters wide, in the right and left lobe, respectively, and that they therefore would have been greater than one centimeter had they been X-rayed. The ALJ's basis for rejecting Dr. Mellen's testimony as equivocal was Dr. Mellen's statement that he was not "one-hundred percent sure" of his conclusion. We disagree. Read in context, Dr. Mellen's qualification was at most an acknowledgment that uncertainty is part of medicine. A refusal to express a diagnosis in categorical terms is candor, not equivocation, and we are of opinion that it enhances rather than undermines Dr. Mellen's credibility. In contrast, the other doctors' adamancy that their opponents were incorrect in all or nearly all respects detracts from credibility.

More importantly, Dr. Mellen was the only doctor to assess the size of the nodules in gross and under a microscope. Even Mynu Coals' doctors agreed that this gave him additional perspective they lacked. For instance, Dr. Rosenberg acknowledged that conducting the autopsy is the "gold standard" for diagnosing disease. Dr. Mellen also testified that the microscopic slides, which he created, on which the other doctors relied exclusively, and which were said to be of excellent technical quality, were too small to encompass a cross-section of the tissue and therefore were of limited utility. So, while Dr. Naeye

---

The use of the word massive by Dr. Mellen is obviously taken from and is entirely consistent with the statute and regulation, and no reason is given to believe that Dr. Mellen used the word massive in any other than its ordinary sense as used by Congress. We have so decided that precise point in *E. Assoc. Coal Co. v. DOWCP*, 220 F.3d 250, 259 (4th Cir. 2000).

claimed that the slides did not support the gross diagnosis, which tes-
timony the ALJ did not cite to reject Dr. Mellen's view, Dr. Naeye
had a partial picture, literally and figuratively. And while Dr. Naeye
"wonder[ed] how accurately" Dr. Mellen measured the lesions, he did
not opine about their measurement. For these reasons, Dr. Mellen's
testimony about the size of the lesions (had they been X-rayed) was
uncontradicted.[5]

Mynu Coals' doctors maintained, however, that Dr. Mellen's not
having Mr. Perry's entire medical history was an offsetting disadvan-
tage. This testimony seems to be reflected in the ALJ's statement that
Dr. Mellen's opinion might not have been the same had he known
about Mr. Perry's smoking history. This is surmise unsupported by
the record. Dr. Mellen stated that he had enough medical history to
diagnose, and he confirmed Dr. Rosenberg's gold standard testimony
by explaining that, between medical history or a gross viewing, the
latter is better. Moreover, Dr. Mellen testified that he had identified
the cancer, which was common in smokers, and that he did not attri-
bute the cancer to coal-dust exposure.

We also note that the ALJ's justifications applied largely to the 4-
centimeter mass in the right lobe. Indeed, the ALJ's discussion of the
6-centimeter mass in the left lobe consists of a one-sentence descrip-
tion of Dr. Mellen's testimony as being that both masses "could be
comprised of coalescent smaller masses." This mischaracterizes the
import of what Dr. Mellen said, which was that "I thought that one
of them was a progressive massive fibrosis [PMF] and the other one

---

[5]Despite the fact that at least four doctors testified on behalf of the
defendant, not one of them contradicted Dr. Mellen's testimony that the
lesions, had they been x-rayed, would have appeared on such x-ray. He
was familiar with such a state of affairs from past experience. In his
deposition, he recited cases in which lesions appearing on x-rays, previ-
ously thought to be cancerous, upon autopsy turned out to be black lung.
No reason is given for rejection of Dr. Mellen's opinion other than he
was not 100% certain, which reason is itself insufficient, as we have
explained. The nodules in this case are considerably larger than the 1.7
cm nodules in *E. Assoc. Coal*, so our statement in that case, that "We are
given no reason to believe that nodules of 1.7 cm would not produce x-
ray opacities greater than 1 cm," 220 F.3d 250 at 258, is applicable here.

was a mixture of PMF, as well as lung cancer," and that "the left lung had no cancer." At best, even if the ALJ were correct about the relevance of composition to the presumption, Dr. Mellen's testimony as to the 6-centimeter mass was rejected too summarily. For all these reasons, Dr. Mellen's testimony was sufficient to trigger the presumption. The refusal to so consider the same was an abuse of discretion, which is a principal cause of our finding that the decision of the Board is not supported by substantial evidence.

## IV.

For the foregoing reasons, the petition for review is granted, the Benefits Review Board's order denying benefits is vacated, and the case is remanded to the Board which will see to the entry of an appropriate order awarding benefits.

*VACATED AND REMANDED WITH INSTRUCTIONS*

WILLIAMS, Circuit Judge, dissenting:

I agree with the majority that substantial evidence does not support the Benefits Review Board's decision. Nevertheless, for the following reasons, I disagree with the majority's decision to remand with instructions for the Board to see to the entry of an order awarding benefits.

## I.

Under 30 U.S.C.A. § 921(c)(3) (West 1986 & Supp. 2006), there is an irrebuttable presumption that a miner was totally disabled at the time of his death due to pneumoconiosis, or that his death was due to pneumoconiosis, if the miner suffered from a chronic dust disease of the lung and "(A) an x-ray of the miner's lungs shows at least one opacity greater than one centimeter in diameter; (B) a biopsy reveals "massive lesions" in the lungs; or (C) a diagnosis by other means reveals a result equivalent to (A) or (B)." *Eastern Assoc. Coal Corp. v. Director, OWCP*, 220 F.3d 250, 255 (4th Cir. 2000); *see also* 20 C.F.R. § 718.304 (2006). "The condition described by these criteria is frequently referred to as 'complicated pneumoconiosis.'" *Id.*

"[B]ecause prong (A) sets out an entirely objective scientific standard — i.e. an opacity on an x-ray greater than one centimeter — x-ray evidence provides the benchmark for determining what under prong (B) is a massive lesion and what under prong (C) is an equivalent diagnostic result reached by other means." *Id.* at 256 (internal quotation marks omitted).

In this case, there were no x-rays of Mr. Perry's lungs. Instead, the administrative law judge (ALJ) considered the opinions of Dr. Mellen, who was the autopsy prosector, and five other doctors who reviewed Mr. Perry's medical history and microscopic slides (made by Dr. Mellen) of Mr. Perry's lungs. Dr. Mellen determined from the autopsy that there were lesions in Mr. Perry's lungs that would show up on an x-ray as an opacity greater than 1 cm, although he qualified his opinion by saying that he was "not a hundred percent sure." (J.A. at 78.) Four other doctors — Drs. Oesterling, Naeye, Rosenberg, and Morgan — concluded that Mr. Perry had simple, not complicated, pneumoconiosis. Only Dr. Perper agreed with Dr. Mellen that Mr. Perry had complicated pneumoconiosis.

In evaluating this evidence, the ALJ "discredit[ed]" Dr. Mellen's opinion that Mr. Perry had complicated pneumoconiosis because Dr. Mellen did not note Mr. Perry's lengthy smoking history and because his opinion was "equivocal." (J.A. at 438.) The ALJ gave "less weight" to Dr. Perper's opinion because it relied on Dr. Mellen's findings without mentioning the fact that those findings did not include Mr. Perry's smoking history or explaining how knowledge of that history would have affected those findings. (J.A. at 439.) Having discounted the two doctors' opinions that were favorable to Mrs. Perry, the ALJ concluded that she had "not proven that [Mr. Perry] had complicated coal workers' pneumoconiosis." (J.A. at 439.)

I agree with the majority that the ALJ improperly discounted the opinion of Dr. Mellen and, by extension, the opinion of Dr. Perper. Although Dr. Mellen expressed some uncertainty in his opinion, that is not a sufficient basis to discredit completely his opinion, for a "reasonable medical opinion is not rendered a nullity because it acknowledges the limits of reasoned medical opinions." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 763 (4th Cir. 1999). The ALJ's discrediting of Dr. Mellen's opinion is particularly troubling because, as the

majority states, Dr. Mellen "was the only doctor to assess the size of the nodules in gross and under a microscope," which gave him a perspective that the other doctors lacked. *Ante* at 10. The ALJ's error of discounting Dr. Mellen's opinion means that he reached a decision after considering only part of the evidence. His decision — and the Board's decision in affirmance — is therefore not supported by substantial evidence.

## II.

Because the Board's decision is not supported by substantial evidence, we should vacate the Board's decision and remand with instructions for the ALJ to consider properly all the medical evidence before making a new determination of whether Mr. Perry had complicated pneumoconiosis. In determining a claim for black lung benefits, "all relevant evidence shall be considered." 30 U.S.C.A. § 923(b). We have repeatedly instructed ALJs to heed this command. In *Eastern Assoc. Coal Co.*, we said that the ALJ "must in every case review the evidence under each prong of § 921(c)(3) for which relevant evidence is presented to determine whether complicated pneumoconiosis is present." 220 F.3d at 256. Evidence under each prong "must be considered and evaluated to determine whether the evidence *as a whole* indicates a condition of such severity that it would produce opacities greater than one centimeter in diameter on an x-ray." *Id.* (emphasis added); *see also Lester v. Director, OWCP*, 993 F.2d 1143, 1145 (4th Cir. 1993) ("To make . . . a determination [of complicated pneumoconiosis], the OWCP necessarily must look at *all of the relevant evidence* presented." (emphasis added)). All of the relevant evidence must be considered because otherwise the existence of complicated pneumoconiosis "could be found even though the evidence as a whole clearly weighed against such a finding." *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 209 (4th Cir. 2000). Nevertheless, rather than vacating the Board's decision and remanding for a new, proper consideration *by the ALJ* of all the evidence, the majority weighs the evidence itself, concludes that Dr. Mellen's opinion triggers the irrebuttable presumption of 20 C.F.R. § 718.304, and remands with the instruction that Ms. Perry be awarded benefits. *Ante* at 9, 12.

In this approach, my good colleagues ignore the limits placed on a court's power to decide a question that Congress has entrusted to

an administrative agency. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency."). It is a fundamental tenet of administrative law that a "judicial judgment cannot be made to do service for an administrative judgment." *Id.* We therefore generally must "remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam). This rule rests on the "basic proposition that a reviewing court may not decide matters that Congress has assigned to an agency." *W. Va. Highlands Conservancy, Inc. v. Norton*, 343 F.3d 239, 248 (4th Cir. 2003).

In *Ventura*, for example, the Board of Immigration Appeals had held that Ventura was not entitled to asylum because he did not fear persecution on account of his political opinion. *Ventura*, 537 U.S. at 13. The Ninth Circuit reversed, finding that the record did show fear of political persecution. The court went on, however, to also reject the alternative argument that the Government had made before the immigration judge, namely, that country conditions in Guatemala had improved to the point that persecution was no longer likely. *Id.* The Supreme Court summarily reversed. The Court noted that a court of appeals is "not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id.* at 16 (internal quotation marks omitted). The Court further explained that the administrative "agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later to determine whether its decision exceeds the leeway that the law provides." *Id.* at 17.

Just as in *Ventura*, "every consideration that classically supports the law's ordinary remand requirement does so here." *Id.* at 16; *see also Gonzales v. Thomas*, 126 S. Ct. 1613, 1615 (2006) (per curiam) (summarily reversing in a case similar to *Ventura* because there existed "no special circumstance . . . that might have justified the [court's] determination of the matter in the first instance," and the court therefore should have "applied the ordinary remand rule" (internal quotation marks omitted)); *W. Va. Highlands Conservancy Inc.*,

343 F.3d at 248-49 (vacating a district court order that attempted to make de novo findings not made by the agency because the "question was for the [agency] to decide, and the district court should have remanded the matter to the [agency] for the appropriate factfinding"). In this case, it is for the agency, and the agency alone, to properly examine all the evidence in order to make the initial determination of whether the irrebuttable presumption should be triggered in favor of Perry. In deciding that matter ourselves, the majority opinion impermissibly oversteps this court's bounds.

## III.

Although I agree with the majority that substantial evidence does not support the Board's decision, I believe that the majority oversteps our review authority. Therefore, I respectfully dissent.